

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JUL 2 1 2016

_for_ CHIEF JUSTICE

This opinion was filed for record
at 8·00 am on July 21, 2016

Susan L. Carlson

**Supreme Court Clerk**

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 91391-9 |
| | ) | |
| v. | ) | |
| | ) | |
| LG ELECTRONICS, INC.; KONINKLIJKE | ) | |
| PHILIPS ELECTRONICS N.V. A/K/A | ) | |
| ROYAL PHILIPS ELECTRONICS N.V.; | ) | |
| PHILIPS ELECTRONICS INDUSTRIES | ) | |
| (TAIWAN), LTD.; SAMSUNG SDI | ) | |
| CO., LTD. F/K/A SAMSUNG DISPLAY | ) | |
| DEVICE CO., LTD.; SAMSUNG SDI | ) | |
| AMERICA, INC.; SAMSUNG SDI | ) | |
| MEXICO S.A. DE C.V.; SAMSUNG SDI | ) | |
| BRASIL LTDA.; SHENZHEN SAMSUNG | ) | |
| SDI CO., LTD.; TIANJIN SAMSUNG SDI | ) | |
| CO., LTD.; SAMSUNG SDI (MALAYSIA) | ) | |
| SDN. BHD.; PANASONIC | ) | |
| CORPORATION OF NORTH AMERICA; | ) | Filed JUL 2 1 2016 |
| HITACHI DISPLAYS, LTD.; HITACHI | ) | |
| ELECTRONIC DEVICES (USA), INC.; | ) | |
| and HITACHI ASIA, LTD., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | En Banc |
| and | ) | |
| | ) | |
| LG ELECTRONICS U.S.A., INC.; | ) | |
| PHILIPS ELECTRONICS INDUSTRIES; | ) | |
| PHILIPS ELECTRONICS NORTH | ) | |
| AMERICA CORPORATION; TOSHIBA | ) | |
| CORPORATION; TOSHIBA AMERICA | ) | |

ELECTRONIC COMPONENTS, INC.;    )
HITACHI, LTD.; MT PICTURE DISPLAY )
CO.; PANASONIC CORPORATION       )
F/K/A MATSUSHITA ELECTRIC        )
INDUSTRIAL CO., LTD.; CHUNGHWA   )
PICTURE TUBES LTD.; CPTF         )
OPTRONICS CO. LTD.; and          )
CHUNGHWA PICTURE TUBES           )
(MALAYSIA) SDN. BHD.,            )
                                 )
                    Defendants.  )
                                 )

GONZÁLEZ, J.—The State of Washington sued more than 20 foreign electronics manufacturing companies (including the petitioners) for price fixing. The State claimed the foreign companies conspired to fix prices by selling CRTs (cathode ray tubes) into international streams of commerce intending they be incorporated into products sold at inflated prices in large numbers in Washington State.

The trial court dismissed on the pleadings, finding it did not have jurisdiction over the foreign companies. The Court of Appeals reversed, concluding the State alleged sufficient minimum contacts with Washington to satisfy both the long arm statute and the due process clause. We affirm the Court of Appeals.

FACTS

In 2012, the State, through the attorney general, filed suit against a number of foreign electronics manufacturers. The State's complaint alleged

2

that between March 1995 and November 2007, the defendants violated the antitrust provision of the Washington Consumer Protection Act, RCW 19.86.030, by conspiring to raise prices and set production levels in the market for CRTs. CRTs were the dominant display technology used in televisions and computer monitors before the advent of LCD (liquid crystal display) panels and plasma display technologies. Due to the unlawful conspiracy, the State alleged, Washington consumers and the State of Washington itself paid supracompetitive prices for the products.

According to the State's complaint, North America was the largest market for CRT televisions and computer monitors during the conspiracy period. Clerk's Papers (CP) at 24. In 1995 alone, 28 million CRT monitors were purchased in North America. *Id.* CRT monitors "accounted for over 90 percent of the retail market for computer monitors in North America in 1999," CRT televisions "accounted for 73 percent of the North American television market in 2004," and "the CRT industry was dominated by relatively few companies." *Id.* at 17, 15. In 2004, four of the defendants together held a collective 78 percent share of the global CRT market. *Id.* at 15. The State alleged that during the conspiracy period, all the defendants manufactured, sold, and/or distributed CRT products, directly or indirectly, to customers throughout Washington.

3

The State asserted jurisdiction pursuant to the long-arm provision of the Washington Consumer Protection Act, RCW 19.86.160. The State also asserted that venue is proper in King County in part because

> the Defendants' and their co-conspirators' activities were intended to, and did have, a substantial and foreseeable effect on Washington State trade and commerce; the conspiracy affected the price of CRTs and CRT Products purchased in Washington; and all Defendants knew or expected that products containing their CRTs would be sold in the U.S. and into Washington.

CP at 3.

Before any discovery took place, certain defendants (collectively Companies) moved to dismiss the State's complaint for lack of personal jurisdiction under CR 12(b)(2). The Companies supported their motions to dismiss with affidavits and declarations stating that the Companies did not sell any products directly to Washington consumers and did not conduct any business in Washington. The Companies also requested attorney fees under Washington's long-arm statute.

The State argued it had pleaded facts sufficient to establish personal jurisdiction at the pleading stage. The State also argued that if the trial court were to consider the Companies' affidavits and declarations, the motions to dismiss would necessarily be converted into CR 56 motions for summary judgment. The State requested the opportunity to conduct general and

4

jurisdictional discovery. The Companies opposed the State's discovery

request.

The trial court granted the motion to dismiss for lack of personal

jurisdiction without expressly addressing the State's discovery request. *Id.*

at 578-79. The trial court also authorized the Companies to request costs

and attorney fees. *Id.* at 597. In March 2013, the trial court entered final

judgment with prejudice under CR 54(b). *Id.* at 598-608. It then granted the

requests for costs and attorney fees.[1] *Id.* at 1070-83. The State appealed.[2]

The Court of Appeals reversed. *State v. LG Elecs., Inc.*, 185 Wn.

App. 394, 425, 341 P.3d 346 (2015). It held that the State had sufficiently

alleged facts establishing personal jurisdiction and that an assertion of

jurisdiction did not offend traditional notions of fair play and substantial

justice. *Id.* at 423-24. The Court of Appeals reversed the award of attorney

fees below because the Companies were no longer prevailing parties, and

declined to award fees on appeal. *Id.* at 425.

---

[1] The Philips entities, which did not submit briefing requesting costs and attorney fees, are an exception.

[2] Certain defendants also moved to dismiss on the grounds that the State's claims were time barred. The trial court denied the motion and certified the matter for discretionary review. The Court of Appeals granted discretionary review of that issue, linked the appeals, and affirmed the trial court's denial of the statute of limitations motions in a separate published opinion. We granted the defendants' petition for review in that case as well and resolve the statute of limitations question by separate opinion in *State v. LG Electronics, Inc.*, No. 91263-7 (Wash. July 14, 2016).

We granted the Companies' petition for review. *State v. LG Elecs., Inc.*, 183 Wn.2d 1002, 349 P.3d 856 (2015). The Companies are supported by the Washington Defense Trial Lawyers and DRI—The Voice of the Defense Bar (on one brief) and the United States Chamber of Commerce as amici curiae. The State is supported in part by the Washington State Association for Justice Foundation as amicus curiae.

ANALYSIS

*I. Standard of Review*

We review CR 12(b)(2) dismissals for lack of personal jurisdiction de novo. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 963, 331 P.3d 29 (2014) (citing *In re Estate of Kordon*, 157 Wn.2d 206, 209, 137 P.3d 16 (2006)). When a motion to dismiss for lack of personal jurisdiction is resolved without an evidentiary hearing, the plaintiff's burden is only that of a prima facie showing of jurisdiction. *MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc.*, 60 Wn. App. 414, 418, 804 P.2d 627 (1991) (citing *Pedersen Fisheries Inc. v. Patti Indus., Inc.*, 563 F. Supp. 72, 74 (W.D. Wash. 1983)).

*II. Personal Jurisdiction*

The parties do not dispute that as long as the assertion of personal jurisdiction complies with due process, personal jurisdiction exists under the

long-arm provision of the CPA, RCW 19.86.160. The due process clause "requir[es] that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (second alteration in original) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)). Thus, a state may authorize its courts to exercise personal jurisdiction over an out-of-state defendant only if the defendant has certain minimum contacts with the state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). For personal jurisdiction to comply with due process, three elements must be met: (1) purposeful "'minimum contacts'" must exist between the defendant and the forum state, (2) the plaintiff's injuries must "'arise out of or relate to'" those minimum contacts, and (3) the exercise of jurisdiction must be reasonable, that is, consistent with notions of "'fair play and substantial justice.'" *Grange Ins. Ass'n v. State*, 110 Wn.2d 752, 758, 757 P.2d 933 (1988) (quoting *Burger King*, 471 U.S. at 472-78).

To establish purposeful minimum contacts, there must be some act by which the defendant "'purposefully avails itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). The parties agree on the applicable test but disagree over whether this requirement has been met.

A foreign manufacturer or distributor does not purposefully avail itself of a forum when the sale of its products there is an "isolated occurrence" or when the unilateral act of a consumer or other third party brings the product into the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980); *Williams v. Romarm, SA*, 410 U.S. App. D.C. 405, 756 F.3d 777 (2014). But where a foreign manufacturer seeks to serve the forum state's market, the act of placing goods into the stream of commerce with the intent that they will be purchased by consumers in the forum state can indicate purposeful availment. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881-82, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011) (Kennedy, J., plurality opinion); *id.* at 888-89 (Breyer, J., concurring); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 109-13, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (lead opinion of O'Connor, J.); *id.* at 117-21 (Brennan, J., concurring); *id.* at 122 (Stevens, J., concurring); *World-Wide Volkswagen*,

444 U.S. at 295-97; *Grange Ins. Ass'n,* 110 Wn.2d at 761-62. The stream of commerce theory does not allow jurisdiction based on the mere foreseeability that a product may end up in a forum state. *See, e.g., World-Wide Volkswagen,* 444 U.S. at 295-97. Instead, the defendant's conduct and connection with the state must be such that it should reasonably anticipate being haled into court there. *Id.* The State argues that the Companies have established purposeful minimum contacts by placing CRTs into the stream of commerce with the knowledge and intent that their CRTs would be incorporated into products sold in massive quantities throughout the United States, including in large numbers in Washington. *See* State of Wash.'s Suppl. Br. at 1.

The Companies argue that the State cannot rely solely on the substantial volume of sales in Washington to establish purposeful availment. *See* Suppl. Br. of Pet'rs at 13-15. The Companies argue that the State is required to show additional actions specifically targeting Washington, such as forum-specific design or in-forum advertising. The Companies rely on *Asahi,* 480 U.S. 102, and *J. McIntyre,* 564 U.S. 873, where the United States Supreme Court issued fractured opinions on the stream of commerce theory.

In *Asahi,* the United States Supreme Court considered the stream of commerce theory in the context of an indemnification action brought in

California by Cheng Shin, a Taiwanese tire manufacturer, against Asahi, the Japanese tire valve manufacturer that had sold an allegedly defective component part to Cheng Shin. 480 U.S. at 106. Cheng Shin had bought and incorporated into its tire tubes hundreds of thousands of Asahi valve assemblies annually for five years, and sold finished tubes throughout the world, including California. *Id.* The United States Supreme Court unanimously held that regardless of whether Asahi had sufficient minimum contacts with California, it would be unfair to assert personal jurisdiction over the two foreign parties in the indemnity action. *Id.* at 114. However, the court fractured on whether Asahi had sufficient minimum contacts.

In a lead opinion authored by Justice O'Connor, four justices concluded that placing a product into the stream of commerce with the mere awareness that the product will be swept into the forum state is insufficient to establish minimum contacts. The justices who signed the lead opinion would have required additional conduct indicating an intent or purpose to serve the specific forum state, including, for example, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* at 112 (lead opinion of O'Connor,

J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.). The lead opinion concluded that Asahi did not have purposeful minimum contacts. *Id.* at 113.

Justice Brennan's concurrence, joined by three justices, concluded that Asahi had sufficient minimum contacts with California. Those justices concluded that a defendant can be subject to jurisdiction consistent with due process whenever the "regular and anticipated flow of products," as opposed to "unpredictable currents and eddies," leads the product to be marketed in the forum state. *Id.* at 116-17 (Brennan, J., joined by White, Marshall and Blackmun, JJ.).

Justice Stevens concurred separately, finding no need to address the minimum contacts inquiry but indicating that whether placement of a product into the stream of commerce rises to purposeful availment will depend on "the volume, the value, and the hazardous character of the components" and opining that Asahi "has arguably engaged in a higher quantum of conduct than '[t]he placement of a product into the stream of commerce, without more.'" *Id.* at 122 (alteration in original) (Stevens, J., joined by White and Blackmun, JJ.). He noted that "[i]n most circumstances I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years

would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world." *Id.*

In *J. McIntyre*, the United States Supreme Court again considered the stream of commerce theory and again issued a fractured opinion. 564 U.S. 873. J. McIntyre Machinery Ltd., a British manufacturer, sold its metal shearing machines to an independent United States distributor, which marketed the machines throughout the United States. *Id.* at 878 (lead opinion of Kennedy, J., joined by Roberts, C.J., and Scalia and Thomas, JJ.). The distributor sold no more than four of the machines to a company in New Jersey, and one allegedly malfunctioned and injured the plaintiff. *Id.* Justice Kennedy's plurality, joined by three justices, adopted a position consistent with Justice O'Connor's *Asahi* opinion and concluded that the plaintiff had not established that J. McIntyre engaged in conduct purposefully directed at New Jersey. *Id.* at 885-86.

Justice Breyer, joined by Justice Alito, concurred, but rejected the plurality's strict rule and concluded on narrow grounds that under the court's split opinions in *Asahi*, personal jurisdiction could not be exercised on the basis of a single sale in a state because there was no regular flow of sales *or* a showing of forum-specific targeting. *Id.* at 888-89 (Breyer, J., concurring, joined by Alito, J.). These justices also rejected the expansive view

proposed by New Jersey that a manufacturer is subject to personal jurisdiction so long as it places its products into the stream of commerce and should know that its products might end up being sold in any of the 50 states, reasoning that such an expansive rule would permit every State to assert jurisdiction against any domestic manufacturer who sells its products to a national distributor "no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue." *Id.* at 891.

When a fragmented United States Supreme Court decides a case "and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion)). Applying the *Marks* standard, we conclude that Justice Breyer's concurring opinion represents the holding of *J. McIntyre*. We reject the Companies' argument that Justice Breyer's opinion endorsed Justice O'Connor's construction of the stream of commerce theory in *Asahi*. Justice Breyer explicitly did not choose either test from *Asahi*. *J. McIntyre*, 564 U.S. at 889-90 (Breyer, J., concurring).

13

Under *J. McIntyre*, a foreign manufacturer's sale of products through an independent nationwide distribution system is not sufficient, absent something more, for a State to assert personal jurisdiction over a manufacturer when only one product enters a state and causes injury. *Id.* at 888-89 (Breyer, J., concurring). *J. McIntyre* did not foreclose an exercise of personal jurisdiction over a foreign defendant where a substantial volume of sales took place in a state as part of the regular flow of commerce. Our interpretation of *McIntyre* is consistent with that of other courts. *See Russell v. SNFA*, 2013 IL 113909, 987 N.E.2d 778, 370 Ill. Dec. 12 (rejecting defendant's contention that Justice Breyer's concurrence should be construed as adopting Justice O'Connor's construction of the stream of commerce theory); *Willemsen v. Invacare Corp.*, 352 Or. 191, 282 P.3d 867 (2012) (finding that the sale in Oregon in a two-year period of more than 1,000 wheelchairs containing the manufacturer's component part established sufficient minimum contacts); *see also Monje v. Spin Master Inc.*, No. CV-09-1713-PHX-GMS, 2013 WL 2369888 (D. Ariz. May 29, 2013) (court order) (finding that the sale of 4.2 million products throughout the United States indicates purposeful availment of forum state market);[3] *cf. Oticon,*

---

[3] We note that this opinion is unpublished and citation by the parties is proper under GR 14.1(b) and Fed. R. App. P. 32.1(a).

*Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 513 (D.N.J. 2011) (finding insufficient minimum contacts where the defendant targeted the national market but only five to nine sales of the product occurred in the forum state).

We find the allegations in the State's complaint sufficient to establish a prima facie case of purposeful minimum contacts. The State alleges that (1) the Companies together dominated the global market for CRTs, (2) the Companies sold CRTs into international streams of commerce with the intent that the CRTs would be incorporated into millions of CRT products sold across the United States and in large quantities in Washington, and (3) along with their coconspirators, the Companies intended for their price-fixing activities to elevate the price of CRT Products purchased by consumers in Washington. CP at 15, 3. Taking these allegations as verities, as we must at this stage, we agree with the State that "[t]he presence of millions of CRTs in Washington was not the result of chance or the random acts of third parties, but a fundamental attribute of [the Companies'] businesses." State of Wash.'s Suppl. Br. at 17.[4]

---

[4] The Companies also call to our attention *Walden v. Fiore*, where the United States Supreme Court concluded that a Nevada court could not assert personal jurisdiction over a police officer who seized cash from the plaintiffs at an airport in Georgia while they were traveling from Puerto Rico to Nevada. __ U.S. __, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014). The court concluded it was not sufficient to base minimum contacts solely on the plaintiff's connections with Nevada and the fact that the plaintiffs felt the effects of

An exercise of jurisdiction based on the allegations in the State's complaint is not foreclosed by *J. McIntyre*, and to dismiss at this stage before relevant jurisdictional discovery would be inconsistent with the legal standards we apply under CR 12(b). While we have few CR 12(b)(2) cases, we find our CR 12(b)(6) cases helpful by analogy. Our liberal notice pleading rules are intended "to facilitate the full airing of claims having a legal basis." *Berge v. Gorton*, 88 Wn.2d 756, 759, 567 P.2d 187 (1977). Consistent with this purpose, CR 8(a)(1) provides that a complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," and we have repeatedly emphasized that we grant CR 12(b)(6) motions for failure to state a claim very "'sparingly and with care.'" *Orwick v. City of Seattle*, 103 Wn.2d 249, 254-55, 692 P.2d 793 (1984)

---

the delayed return of their gambling funds while they were residing in Nevada. Under those circumstances, the police officer's connection to Nevada was not purposeful but merely "'random'" and "'fortuitous.'" *Id.* at 1123 (quoting *Burger King*, 471 U.S. at 475). *Walden* is not helpful to our analysis in the present case, where it is alleged that the Companies intended to serve the Washington market and injure Washington consumers with price-fixed CRT Products. *See* CP at 3, 27; *Calder v. Jones*, 465 U.S. 783, 791, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984) (holding that jurisdiction in California was proper because intentional conduct by defendants in Florida was "calculated to cause injury to respondent in California").

The dissent posits that we should look only to *Calder* and *Walden*, not to the *J. McIntyre* line of cases, in our personal jurisdiction analysis, distinguishing between a "stream of commerce" test and an "effects" test. Dissent at 6. We note that this question is not presented in this case, as neither of the parties asked us to distinguish these tests and disregard the stream of commerce one. In the absence of briefing from the parties, we decline to adopt the dissent's approach.

(quoting 27 FEDERAL PROCEDURE § 62:465 (1984) and citing 5 CHARLES

ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE § 1349, at 541 (1969)). A complaint survives a CR

12(b)(6) motion if *any* state of facts could exist under which the claim could

be sustained. *Id.* at 255; *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89

Wn.2d 959, 961, 577 P.2d 580 (1978). We see no reason to apply a

different approach to a CR 12(b)(2) motion, and in fact we previously took

such an approach in *FutureSelect*, where we reversed a trial court's decision

to dismiss on the pleadings after considering numerous arguments for

dismissal, including a CR 12(b)(2) argument. 180 Wn.2d at 959. There, we

concluded that "[a]t this stage of litigation, the allegations of the complaint

establish sufficient minimum contacts to survive a CR 12(b)(2) motion." *Id.*

at 963. We found that the trial court dismissed prematurely, some limited

discovery was warranted, and defendant "may renew its jurisdictional

challenge after appropriate discovery has been conducted." *Id.* at 966, 963.

Consistent with these standards, we find the State's complaint survives.

Nothing in our opinion precludes the Companies from renewing their

motions after further discovery bearing on relevant facts.[5] The Companies

---

[5] Our dissenting colleague concludes the court lacks personal jurisdiction because the State did not specifically allege in its complaint that the defendants had control over the prices of CRT products sold in Washington. We note that, as discussed, the State alleged

17

argue that since they submitted declarations the State cannot stand on the allegations in its complaint but must submit evidence to meet its burden, citing federal case law holding that courts are not permitted to "'assume the truth of allegations in a pleading which are contradicted by affidavit.'" Suppl. Br. of Pet'rs at 19 (internal quotation marks omitted) (quoting *Alexander v. Circus Circus Enters., Inc.*, 972 F.2d 261, 262 (9th Cir. 1992)). None of the Companies' affidavits contradict the stream of commerce allegations in the complaint, however, except arguably that of Koninklijke Philips Electronics NV (KPNV), which claims it is merely a holding company and did not manufacture any products. *See* CP at 105. Jurisdictional discovery as to KPNV at this stage may be warranted because "'pertinent facts bearing on the question of jurisdiction are controverted.'" *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (quoting *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)). Prior to appropriate discovery, however, we decline to find that an allegation in the complaint is defeated by a contrary statement in a declaration.[6] With

---

that the defendants conspired with CRT and CRT product manufacturers to "ensure[] that price increases for CRTs were passed on to indirect purchasers of CRT Products." CP at 20. These allegations are sufficient to survive a motion to dismiss on the pleadings.

[6] Given our resolution of the case, we decline the invitations of the parties and amici curiae to outline specific procedures required for a trial court to resolve CR 12(b)(2) motions. At this juncture, we leave it to the discretion of trial courts to resolve CR 12(b)(2) motions in accordance with relevant Washington court rules.

the State having sufficiently asserted purposeful minimum contacts at this stage, the burden shifts to the Companies to present a compelling case that the exercise of jurisdiction is unreasonable and inconsistent with notions of fair play and substantial justice, "'consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.'" *FutureSelect*, 180 Wn.2d at 963-64 (internal quotation marks omitted) (quoting *Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 767, 783 P.2d 78 (1989)). At this stage, all of these considerations weigh strongly in favor of finding that jurisdiction is reasonable. The inconvenience for the large multinational Companies to defend themselves in the forum they intentionally targeted with price fixed products does not outweigh the State's strong interest in ensuring Washington citizens receive the protection of state antitrust laws, especially since Washington is the only forum in which indirect consumers of CRTs may be entitled to recovery.

CONCLUSION

Taking the allegations of the complaint as true, we find that the State has made a prima facie showing of purposeful minimum contacts and that asserting personal jurisdiction over the Companies is not unfair or

19

unreasonable. We affirm the Court of Appeals and remand for further

proceedings consistent with this opinion.[7]

---

[7] Given our disposition, we conclude that the Court of Appeals properly reversed the trial court's award of attorney's fees to the companies, and we decline the companies' request for attorney's fees for this appeal.

González, J.

WE CONCUR:

Johnson, J.

Wiggins, J.

Fairhurst, J.

Hunt, J, P.T.

No. 91391-9

GORDON McCLOUD, J. (concurring in part and dissenting in part)—The

State filed this antitrust action against several foreign manufacturers of CRTs[1] and

their out-of-state distributors alleging a conspiracy to fix the global market price of

CRTs. Defendants[2] moved to dismiss due to lack of personal jurisdiction under Civil

Rule (CR) 12(b)(2) and supported their motions with unrebutted declarations about

their lack of contacts in our state.

---

[1] CRTs (cathode ray tubes) are a form of display technology that was widely used in televisions and computer monitors until the introduction of LCD (liquid crystal display) and LED (light-emitting diode) displays.

[2] Some defendants did not challenge Washington's jurisdiction. The relevant defendants here are Koninklijke Philips Electronics NV; Philips Electronics Industries (Taiwan) Ltd.; LG Electronics Inc.; Samsung SDI Co. Ltd.; Samsung SDI America Inc.; Samsung SDI Mexico SA de CV; Samsung SDI Brasil Ltda.; Shenzhen Samsung SDI Co. Ltd.; Tianjin Samsung SDI Co. Ltd.; and Samsung SDI (Malaysia) Sdn. Bhd. (Defendants).

This case involves an intentional conspiracy to fix prices in violation of RCW 19.86.030—not a defective product.[3] The majority nevertheless applies a "stream of commerce" test derived from fractured Supreme Court opinions involving products liability, i.e., *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (plurality opinion) and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011) (plurality opinion), and concludes that the trial court had jurisdiction under one of the nonmajority, nonplurality opinions in one of these cases. Majority at 8, 15. The Supreme Court, however, has applied a different test to intentional torts. It holds that when a plaintiff claims injury from the *intentional* acts of another, the test for whether a court has specific personal jurisdiction over an out-of-state defendant is the "effects" test articulated in *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.

---

[3] Under RCW 19.86.030, "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." The legislature patterned this provision after the federal Sherman Act, 15 U.S.C. § 1. When the Washington Legislature passed the Consumer Protection Act, ch. 19.86 RCW, it intended for our courts to be guided by the interpretation that the federal courts give to the corresponding federal statutes. RCW 19.86.920. Federal courts apply two tests to evaluate conduct that allegedly violates the Sherman Act. Both tests require proof of intentional wrongdoing. *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 344-45, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982) (plurality opinion) (per se price-fixing violations of Sherman Act section 1); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1296 (9th Cir. 1983) (non-per-se violations).

2

Ed. 2d 804 (1984). *See also Walden v. Fiore*, __ U.S. __, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014). I would apply *Calder*'s "effects" test and find no jurisdiction. But even if a "stream of commerce" analysis applied, most Defendants[4] filed unrebutted declarations showing that Washington lacked sufficient minimum contacts to support jurisdiction under the controlling "purposeful availment" standard for the "stream of commerce" analysis articulated in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). I therefore respectfully dissent.

## FACTUAL BACKGROUND

The State filed this antitrust action in Washington State against several foreign manufacturers, marketers, and sellers of CRTs, alleging that they colluded to fix the global market price of CRTs at supracompetitive levels in violation of the Consumer Protection Act, chapter 19.86 RCW. Specifically, the complaint alleged that Defendants sold these CRTs at inflated prices to out-of-state assemblers and that these assemblers then incorporated the CRTs into end products (CRT Products) and then later sold these CRT Products to consumers in Washington. According to the

---

[4] There is one exception. Three defendants (Shenzhen Samsung SDI Co. Ltd., Samsung SDI Brasil Ltda., and Samsung SDI (Malaysia) Sdn. Bhd. (collectively SDI Defendants) submitted declarations admitting that they shipped CRT component parts to a manufacturer in Washington during the alleged conspiracy period. CP at 206.

3

State, the end purchasers of CRT Products suffered the ultimate harm from the passed-on overpricing. Clerk's Papers (CP) at 18, 20. In its complaint, the State does not estimate how many CRT Products—or even how many of Defendants' CRTs—were purchased by Washington consumers during the 12-year conspiracy period, but notes that 28 million CRT monitors were purchased in North America in 1995 alone and that Defendants collectively held a 78 percent share of the global CRT market. CP at 24, 15.

Defendants, who are not Washington residents, moved to dismiss due to lack of personal jurisdiction. They argued, and filed declarations, to prove that they lacked sufficient minimum contacts with the Washington forum. The State acknowledges that Defendants operated mainly outside of Washington, with their principal places of business in the Netherlands, South Korea, Taiwan, China, Malaysia, Brazil, Mexico, and California. CP at 4-12. The State did not contest Defendants' declarations filed in support of their CR 12(b)(2) motions showing that they maintained no offices in Washington and employed no Washington employees. CP at 40-42, 56-64, 84-86, 104-06, 203-06. The State did not challenge Defendants' showing that for many of them, their only connection with Washington was that the CRTs they manufactured were incorporated into CRT Products by immediate

4

purchasers, and then the CRT Products were sold by those immediate purchasers to nonparticipants in that original purchase, i.e., to Washington consumers.

The majority contends that personal jurisdiction is proper in Washington because the complaint alleged that "(1) the [Defendants] together dominated the global market for CRTs, (2) the [Defendants] sold CRTs into international streams of commerce with the intent that the CRTs would be incorporated into millions of CRT products sold across the United States and in large quantities in Washington, and (3) along with their coconspirators, the [Defendants] intended for their price-fixing activities to elevate the price of CRT Products purchased by consumers in Washington." Majority at 15 (citing CP at 15, 3). Nowhere in the complaint, however, did the State allege that Defendants had control over what costs their direct buyers passed on to the indirect end purchasers or that they controlled where their buyers would choose to sell the CRT Products.

## ANALYSIS

I.      CONSPIRACY TO FIX PRICES IN VIOLATION OF RCW 19.86.030 IS AN INTENTIONAL WRONG, NOT A PRODUCT DEFECT, SO JURSIDICTION SHOULD BE DETERMINED UNDER THE *CALDER* "EFFECTS" TEST APPLICABLE TO INTENTIONAL HARMS, NOT A "STREAM OF COMMERCE" TEST APPLICABLE TO PRODUCTS LIABILITY

*A. The Supreme Court Has Adopted Two Different Tests for Analyzing a Defendant's "Minimum Contacts"*

5

The majority is certainly correct that a court cannot exercise specific personal jurisdiction over an out-of-state defendant unless such jurisdiction is consistent with the due process clause. Majority at 6-7; U.S. CONST. amend. XIV, § 1. It is also correct that the due process clause requires sufficient "minimum contacts" between the defendant and the forum state to support such jurisdiction. *Id.* at 7 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)).

The Supreme Court, however, has applied two different tests for evaluating the sufficiency of "minimum contacts" to support specific personal jurisdiction: (1) the "stream of commerce" test derived from product liability cases, *World-Wide Volkswagen, Asahi,* and *J. McIntyre*; and (2) the "effects" test derived from intentional tort cases, *Calder* and *Walden*. The first question for us is which test applies here.

> B. *The Majority Finds Jurisdiction under Justice Brennan's "Chain of Distribution" Analysis, Derived from Product Liability Cases, Even Though* J. McIntyre *Requires "Something More"*

The majority applies a "stream of commerce" analysis to the jurisdictional question in this case. More specifically, the majority applies one of several different "stream of commerce" tests that some Supreme Court justices have endorsed but that no Supreme Court majority has ever adopted as a holding. Majority at 8-14.

6

The "stream of commerce" analysis was adopted by the Supreme Court in product liability cases and has been applied by that Court only to product liability cases. It was introduced as a basis for evaluating minimum contacts in *World-Wide Volkswagen*—a products liability case involving a defective automotive fuel system. 444 U.S. at 297-98. In that case, the Court unanimously recognized that in the right circumstances, a corporation could be subject to personal jurisdiction in a foreign forum based on the distribution of its products in that foreign forum. *Id.* The Court began by explaining that personal jurisdiction arises if the corporation "deliver[ed] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 298. The Court further clarified, though, that jurisdiction attached only where "the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from *the efforts of the manufacturer or distributor* to serve, directly or indirectly, the market for its products in [the forum state]." *Id.* at 297 (emphasis added). The Court rejected the notion that jurisdiction could exist simply because it was foreseeable that the defendant's product might enter the forum state. *Id.* at 296. The defendant's purposeful availment of the benefits of the forum, the Court explained, is key. *Id.* at 295-98.

Although the *World-Wide Volkswagen* Court unanimously agreed that placement of a product in the "stream of commerce" could support jurisdiction over an out-of-state defendant in product liability actions in certain circumstances, it later split on what activities would be sufficient to trigger such jurisdiction. The fractured opinions on this topic began in 1987 in *Asahi*. In *Asahi*, the question was whether a California court could exercise jurisdiction over foreign manufacturers who sold component products overseas, based on the fact that the overseas purchasers integrated those component parts into retail products and some of those retail products were sold in California. 480 U.S. at 106-07. Justice O'Connor's plurality opinion proposed a "stream of commerce plus" test for evaluating personal jurisdiction over an out-of-state defendant in such cases. Under that test, the plaintiff must show that the defendant did more than simply place its products into the stream of commerce to support such jurisdiction. The plaintiff must also show "conduct of the defendant" indicating an intent or purpose to serve the market in the forum state, such as designing the product for the forum market or marketing the product there. *Id.* at 112.

In contrast, Justice Brennan proposed a "chain of distribution" test. Under that test, the plaintiff need show only that the "regular and anticipated flow of

8

products from manufacture to distribution to retail sale" occurred in the forum state to support personal jurisdiction there. *Id.* at 117 (Brennan, J., concurring).

Justice Stevens used a third test. That test considered the defendant's "course of dealing[s]" including the "volume, the value, and the hazardous character of the components." *Id.* at 122 (Stevens, J., concurring).

None of these tests garnered a majority. Indeed, at least five justices rejected each test. A majority of the Court instead resolved the jurisdictional question on other grounds related to traditional notions of fair play and substantial justice. *Id.* at 113. Thus, the Court left open the confusing question of what to do with the various tests that were articulated and then rejected.

As the majority correctly observes, the Supreme Court clarified these tests somewhat in *J. McIntyre*. In that 2011 decision, the Court ruled that the plaintiff must show that the defendant did "something more" than just sell its products through a nationwide distributor with the hope that they might be sold in the forum state to support forum jurisdiction. *J. McIntyre*, 564 U.S. at 888-89 (Breyer, J., concurring); *see* majority at 13-14. This "something more," the majority recognizes, modified Justice Brennan's "chain of distribution" test. *See* majority at 13-14.

The majority, however, denies that this "something more" is the equivalent of Justice O'Connor's "plus" factor.[5] *See* majority at 14. Instead, the majority interprets this "something more" as merely requiring more than a single, isolated product ending up in the forum state. Majority at 13-14. Thus, the majority takes the position that *J. McIntyre* adopted the bulk of Justice Brennan's *Asahi* concurrence (without saying so).

The majority then applies Justice Brennan's "chain of distribution" test (not Justice O'Connor's *Asahi* plurality or *World-Wide Volkswagen*) and holds that the trial court has jurisdiction over Defendants in this case because the State alleged that Defendants placed large quantities of their products into international streams of commerce with the knowledge that they will likely enter the Washington market at

---

[5] This is probably because the State's complaint clearly fails Justice O'Connor's "stream of commerce plus" test, which requires that the defendant either designed its product for or actually marketed its products in the forum state. As Justice O'Connor explained in *Asahi*, "the placement of a product into the stream of commerce"—even hundreds of thousands of it—"without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi*, 480 U.S. at 112. Here, the State has not alleged that Defendants marketed in Washington State or designed their products to target Washington purchasers. On the contrary, the complaint alleged that Defendants had agreed to use *uniform* CRT designs in order to make it easier for them to monitor their agreement to fix prices for *identical* items. CP at 13. This is not enough to satisfy O'Connor's plus factor.

10

some point, and that many more than one of them did enter our state. Majority at 15. This is probably a correct application of Justice Brennan's test.

But *J. McIntyre* did not silently adopt Justice Brennan's *Asahi* concurrence. In fact, a majority of the justices in *J. McIntyre* held that New Jersey, the forum state, *lacked* jurisdiction over the foreign manufacturer, despite the fact that its metal-shearing machine was sold to a distributor who resold it there, and despite the fact that the machine seriously injured a worker there. When one compares those facts to the facts in the instant case, it is clear that there is even less of a connection between the manufacturers and the plaintiff here than between the manufacturer and the plaintiff there: J. McIntyre at least entered the United States' stream of commerce, rather than just the global, international market; attended annual conventions in the United States; and sold its machines to a domestic distributor, knowing that those machines would be sold throughout the United States. *J. McIntyre*, 564 U.S. at 878. The State's complaint does not allege that the Defendants ever even visited the United States, let alone Washington.

The majority seems to recognize that its analysis is somewhat inconsistent with *J. McIntyre*, with the supposed *J. McIntyre* endorsement of Justice Brennan's test, and even with *World-Wide Volkswagen*. It therefore supports its conclusion with a fact peculiar to this case and missing from those stream of commerce cases:

11

the intentional nature of Defendants' alleged conspiracy. Majority at 15. I agree that that fact is peculiar to this case and hence calls for a different analysis here. But it does not call for yet another different stream of commerce test made especially for the intentional conspiracy situation. Instead, it underscores the importance of using the "minimum contacts" test that the Supreme Court has already adopted—unanimously—for just such intentional tort situations: the *Calder* "effects" test.[6]

### C. *The* Calder *"Effects" Test Is the One that the Supreme Court Applies Where, as Here, Intentional Torts Are Alleged*

Each time the Supreme Court has answered a jurisdictional question involving an intentional act, it has unanimously applied the "effects" test rather than the "stream of commerce" test. *See Calder*, 465 U.S. 783 (intentional act of libel); *Walden*, 134 S. Ct. 1115 (intentional act of fraud). Under the *Calder* "effects test,"

---

[6] The majority declines to consider whether the *Calder* "effects" test is the proper test to apply on the ground that that issue is not properly presented. Majority at 16 n.4. But the question presented is whether the State alleged sufficient minimum contacts with Defendants for a Washington court to assert personal jurisdiction over them. To answer that minimum contacts question, we must first decide which minimum contacts test applies. And Defendants did cite *Walden*'s minimum contacts rule. Suppl. Br. of Pet'rs at 15-17 ("In *Walden v. Fiore*, the Court reaffirmed the principle that personal jurisdiction must be grounded in actions by the defendant, not those by the plaintiff or third parties."). Amicus United States Chamber of Commerce then expressly argued that we should apply *Walden*, rather than the stream of commerce decisions, to this case. Amicus Br. of United States Chamber of Commerce at 9-11 ("The rule adopted by the court of appeals cannot be reconciled with *Walden*'s requirement that the defendant itself create a connection with the forum.").

12

the plaintiff must show that the defendant (1) committed an intentional act (2) expressly aimed at the forum state, (3) causing harm, the brunt of which was suffered—and which the defendant knew would likely be suffered—in the forum state. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)).

The Court applied this test for the first time in a case involving the intentional tort of libel. In *Calder*, a California actress filed a lawsuit in California against two employees of a Florida magazine, alleging that they had published a libelous article about her. 465 U.S. at 784. Although the Florida defendants never entered California in connection with the article, the Supreme Court nevertheless held that California had jurisdiction over them. The Court found the defendants had sufficient contacts with California because they made phone calls to California sources to obtain information for their article, they wrote the story about the plaintiff's activities in California, they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in California, and they knew the plaintiff would suffer the brunt of that injury in California where she resided. *Walden*, 134 S. Ct. at 1123; *Calder*, 465 U.S. at 785-90.

The Supreme Court again unanimously applied the "effects" test in evaluating Nevada's jurisdiction over an action for fraud, another intentional act, in *Walden*. In that case, airplane passengers detained at an airport in Georgia filed a *Bivens*[7] action against several Georgia police officers, alleging that they had intentionally seized and kept plaintiffs' cash without probable cause and later lied about it in false affidavits. *Walden*, 134 S. Ct. at 1124. But the plaintiffs filed in Nevada, where they lived, rather than Georgia, where the seizure occurred. The question for the Supreme Court was whether the Nevada court had personal jurisdiction over these out-of-state officers, since the officers knew at the time of the seizure that the plaintiffs resided in Nevada and that they were headed to Nevada to gamble with the monies seized. *Id.* at 1119. The Supreme Court unanimously held that Nevada lacked jurisdiction. According to the Court, due process requires more than just knowledge of the plaintiffs' strong forum connections or that the plaintiffs would suffer foreseeable harm in the forum from the defendants' acts. *Id.* at 1125. It requires that the defendants themselves have some contact with the forum state. *See id.* at 1122. Because the officers' relevant conduct occurred entirely in Georgia, due

---

[7] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).

14

process clause protections barred the Nevada court from exercising specific personal jurisdiction over them. *Id.* at 1126.

The *Walden* Court applied *Calder*'s "effects" test but distinguished *Calder*'s outcome because "the reputation-based 'effects' of the alleged libel [in *Calder*] connected the defendants to California, not just to the plaintiff." *Id.* at 1123-24. This strong connection "was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons." *Id.* at 1124.

Under controlling Supreme Court precedent, the *Calder* "effects" test applies to actions, such as this, involving an intentional act.

### D. The Supreme Court Unanimously Applied the "Effects" Test in Calder *Even Though a Product Was Involved*

To be sure, an antitrust action involving a price-fixing conspiracy over component parts does involve a product, even though it also constitutes an intentional act. Because of this, lower courts have struggled over which test to apply in this hybrid context.

Many apply the "effects" test to such antitrust actions. *E.g., In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207-08 (2d Cir. 2003) (per curiam); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal.

15

2014); *Am. Copper & Brass, Inc. v. Mueller Eur., Ltd.*, 452 F. Supp. 2d 821, 828-29

(W.D. Tenn. 2006); *In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15, 32 (D.D.C.

2003); *see also In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2015 WL

3638551, at *2 (N.D. Cal. June 11, 2015) (court order); *In re Fasteners Antitrust

Litig.*, No. 08–md–1912, 2011 WL 3563989, at *12 (E.D. Pa. Aug. 12, 2011) (court

order); *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02-6030, 2007

WL 2212713, at *6 (D.N.J. July 30, 2007) (unpublished).[8] These courts reason that

the "effects" test applies because a price-fixing antitrust action primarily involves an

intentional tort. *Bulk [Extruded] Graphite*, 2007 WL 2212713, at *5; *Fasteners*,

2011 WL 3563989, at *12.

Others apply a "stream of commerce" analysis to such antitrust actions. *E.g.*,

*Merriman v. Crompton Corp.*, 282 Kan. 433, 467-68, 146 P.3d 162 (2006);

*Frankenfeld v. Crompton Corp.*, 2005 SD 55, 697 N.W.2d 378, 385-86; *Holder v.

Haarmann & Reimer Corp.*, 779 A.2d 264, 273-74 (D.C. 2001); *Four B Corp. v.

Ueno Fine Chems. Indus., Ltd.*, 241 F. Supp. 2d 1258, 1265 (D. Kan. 2003). The

Kansas Supreme Court's only reason for applying the "stream of commerce"

analysis in the antitrust price-fixing context was that at least one other court had

---

[8] Citation to these unpublished cases is permitted pursuant to GR 14.1(b) and Fed. R. App. P. 32.1 (permitting citation to federal decisions issued on or after January 1, 2007).

done so. *Merriman*, 282 Kan. at 468 (citing *Hitt v. Nissan Motor Co.*, 399 F. Supp. 838 (S.D. Fla. 1975)).

Some courts apply both tests. *E.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 562-65 (M.D. Pa. 2009); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 02–1486 PJH, 2005 WL 2988715, at *5-7 (N.D. Cal. Nov. 7, 2005) (court order).[9]

The Supreme Court, however, applied only the "effects" test in *Calder* even though it also involved a product—a magazine—that was widely distributed throughout the forum state. The *Calder* Court upheld jurisdiction in California not based on the fact that 600,000 copies of the defendants' magazine were sold weekly in California, but "based on the 'effects' of their Florida conduct in California." 465 U.S. at 789. *Calder* therefore supports applying only the "effects" test in an action such as this, where the gravamen of the claim is the defendant's intentional wrongdoing and not a defect in a traveling product.

## II.   JURISDICTION IS LACKING UNDER BOTH THE *CALDER* "EFFECTS" TEST AND THE CONTROLLING "STREAM OF COMMERCE" TEST

### A. Washington Lacks Personal Jurisdiction over Most Defendants under the "Effects" Test

---

[9] Citation to these unpublished cases is permitted pursuant to GR 14.1(b) and N.D. Cal. Civ. Local R. 3-4(e).

17

As discussed above, for a court to have personal jurisdiction over an out-of-state defendant under the "effects" test, the plaintiff must show that the defendant (1) committed an intentional act (2) expressly aimed at the forum state, (3) causing harm, the brunt of which was suffered—and which the defendant knew would likely be suffered—in the forum state. *CollegeSource*, 653 F.3d at 1077.

The State did allege that Defendants committed an intentional act—conspiracy to fix the price of CRTs. The injury alleged, however, relates to the inflated price of *CRT Products*, not CRTs. The State did not allege any facts showing that the conspiracy targeted purchasers of CRTs in Washington. Nor did it allege that any of the "unlawful agreements" forming the underlying conspiracy occurred in Washington. In short, the complaint lacks any allegation that Defendants ever sold products in Washington or ever had control over the prices of CRT Products in Washington. The complaint instead alleged that some effects of the conspiracy over CRT prices were ultimately felt in Washington by Washington consumers who purchased *CRT Products* due to passed-on overpricing. CP at 17.

To be sure, the complaint did allege that Defendants *expected* direct purchasers of their CRTs to pass on the inflated prices to retail consumers of CRT Products: "Defendants concluded that they needed to make their price increase on

18

CRTs high enough so that their direct customers would be able to justify a corresponding price increase to indirect purchasers. In doing so, Defendants' actions ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products." CP at 20. But conclusory allegations about Defendants' expectations are not facts that would support jurisdiction. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032, 750 P.2d 254 (1987). At most, the State alleged that Defendants knew retail consumers of CRT Products would likely be harmed indirectly by their price-fixing of CRTs.

The Supreme Court has already held that this is not enough under the "effects" test. According to its unanimous decision in *Walden*, the plaintiff must allege more than just the defendant's knowledge that the plaintiff resides in the forum state or that some harm would likely be felt there. Indeed, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in any meaningful way." *Walden*, 134 S. Ct. at 1125. This means that "jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct *by the defendant* that creates the necessary contacts with the forum." *Id.* at 1123 (emphasis added). From this, it follows that "the plaintiff cannot be the only link between the defendant and the forum," no matter how significant the plaintiff's contact with the forum may be. *Id.*

19

at 1122.  As discussed above, the State has not provided any link between Defendants' conduct and this state other than the fact that end consumers indirectly harmed by their alleged price-fixing conspiracy resided here.  Jurisdiction is therefore lacking under the Supreme Court's "effects" test.

The Defendants' declarations, for the most part, underscore that failure.  Most Defendants[10] submitted declarations showing that they neither sold nor advertised CRTs in Washington State.  CP at 40-42, 56-64, 84-86, 104-06, 203-06.  In the absence of any connection between these Defendants' acts and Washington, *Walden* precludes Washington courts from asserting personal jurisdiction over them.

Several lower courts that have considered this issue in the same context as that presented here—an intentional price-fixing conspiracy claim—have come to the same conclusion.  In *Chocolate Confectionary*, for example, the plaintiffs filed an antitrust action in Pennsylvania, alleging that Mars Canada had conspired to fix the price of chocolate confectionary products in the United States and that it caused

---

[10] There is one exception.  The SDI Defendants submitted declarations admitting that they shipped CRT component parts to a manufacturer in Washington during the time of the alleged conspiracy.  CP at 206.  This is sufficient conduct "expressly aimed" at Washington to confer jurisdiction in Washington over the SDI Defendants.  *See Vitamins*, 270 F. Supp. 2d at 32-33 (finding specific personal jurisdiction in Kansas under the "effects" test based on the defendant's sale of price-fixed choline chloride products in Kansas over a four year period).

20

American consumers to pay artificially inflated prices for chocolate goods. 602 F. Supp. 2d at 548. Defendant Mars Canada disputed Pennsylvania's jurisdiction over it. The district court applied the *Calder* "effects" test and found that it lacked jurisdiction over Mars Canada because the plaintiffs had failed to show that the company had specifically directed conduct toward the relevant forum (there, the United States[11]). *Id.* at 564-65. In particular, the district court noted that the plaintiffs had not alleged that Mars Canada was involved in any discussions about the pricing of American confectionary products or that it had any control over in-forum pricing. *Id.*

Like the plaintiffs in *Chocolate Confectionary*, the State in this case failed to allege that Defendants engaged in discussions about the pricing of CRT Products in Washington or that they controlled the pricing of those products here. This is because the CRT Products were assembled and sold by the direct purchasers not the Defendants.[12] *Accord CRT Antitrust Litig.*, 27 F. Supp. 3d at 1012-13 (dismissing

---

[11] Federal courts have identified the United States as the relevant forum in federal antitrust actions under the Sherman Antitrust Act. *E.g.*, *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1415-17 (9th Cir. 1989); *CRT Antitrust Litig.*, 27 F. Supp. 3d at 1008.

[12] The majority infers from the State's complaint an allegation of control over the pricing of CRT Products where none exists. Majority at 17 n.5. The State's complaint alleged that "Defendants also agreed on the prices at which some of the Defendants would sell *CRTs* to their own corporate subsidiaries and affiliates that manufactured CRT

21

complaint for lack of jurisdiction in an indirect purchaser action involving price-fixing allegations because there were no allegations in the complaint that the defendants specifically shared information with their assemblers about the forum market, or that they coordinated with them about in-forum pricing). Following *Chocolate Confectionary* and *CRT Antitrust Litig.*, Washington courts lack jurisdiction over Defendants in this case.

The court came to the same conclusion in *American Copper & Brass*. 452 F. Supp. 2d at 828-29. In that case, the plaintiffs sued a manufacturer of copper tubing in Tennessee for conspiracy to fix the global price of copper tubing, which resulted in indirect purchasers paying artificially high prices for such products in the United States. *Id.* at 824. The defendant submitted affidavits stating that they never sold, distributed, or sold for distribution any products into the United States. *Id.* at 828. The court ruled that it lacked jurisdiction over the defendant because there was no allegation of contact between the defendant and the forum (there, the United States). *Id.* at 829. According to that court, it is not enough to say that the defendant "'[was] the leading global manufacturer of copper tubing.'" *Id.* The plaintiff must instead allege conduct by the defendant "'expressly aimed'" at the forum. *Id.*

---

Products." CP at 20 (emphasis added). The State did not allege that Defendants had control over or made agreements regarding the price of CRT *Products*.

A district court for the Northern District of California also applied the "effects" test in an antitrust action involving price-fixing allegations and found jurisdiction lacking over the foreign defendants. *DRAM*, 2005 WL 2988715, at *6-7. The district court reasoned, "Although plaintiffs allege that defendants have committed an intentional act by way of their participation in a price-fixing conspiracy, plaintiffs fail to allege that defendants' conspiratorial acts were individually targeted towards any plaintiff whom defendants knew to be residents of [the forum states]. Nor can plaintiffs do so, given the uncontroverted testimony offered by defendants demonstrating that they have never manufactured nor sold any [dynamic random access memory (DRAM)] in any of the forum states, nor do they maintain any business or corporate formalities in the forum states, nor do they receive any substantial revenue from the sales of DRAM (or any other products) in the forum states." *Id.* at *6 (emphasis omitted).

Like the foreign manufacturers in *Chocolate Confectionary*, *American Copper & Brass*, and *DRAM*, most Defendants[13] here did not direct activities toward the forum state (Washington) and did not sell products to customers here. The fact

---

[13] Koninklijke Philips Electronics NV; Philips Electronics Industries (Taiwan) Ltd.; LG Electronics Inc.; Samsung SDI America Inc.; Samsung SDI Mexico SA de CV; Shenzhen Samsung SDI Co. Ltd.; and Tianjin Samsung SDI Co. Ltd.

that they dominated the global market share for CRT sales or that their products were later incorporated into other products that were then assembled, sold, and distributed to indirect purchasers by other parties in the forum state is insufficient under these persuasive authorities.

### B. *The Result Is the Same under Controlling "Stream of Commerce" Authority*

Even if the majority were correct and the "stream of commerce" analysis did apply here, the result would be the same under controlling "stream of commerce" precedent. As previously discussed, despite the Supreme Court's attempts to clarify "stream of commerce" jurisdiction in *Asahi* and *J. McIntyre*, it has yet to adopt any of the "stream of commerce" tests articulated by Justice O'Connor, Justice Brennan, and Justice Stevens in *Asahi*. As the majority correctly observes, the only thing five Supreme Court justices agreed on in those cases was that a foreign manufacturer's sale of products through an independent, nationwide distribution system is not sufficient, absent something more, for a state to assert personal jurisdiction over the manufacturer when only one product enters the forum state and causes injury. Majority at 13-14 (citing *J. McIntyre*, 564 U.S. at 889 (Breyer, J., concurring) for the narrowest holding). But this result, as Justice Breyer observed, stems not from any of the tests articulated in *Asahi*, but from the application of *World-Wide*

24

*Volkswagen*. *World-Wide Volkswagen* thus seems to be the only controlling Supreme Court authority on "stream of commerce" analysis even after *Asahi* and *J. McIntyre*. *Accord State v. Atl. Richfield Co.*, 2016 VT 22, __ Vt. __, __ A.3d __, 2016 WL 556174, at *6 (Feb. 12, 2016).

*World-Wide Volkswagen* unambiguously holds that foreseeability of a defendant's product eventually entering the forum state, alone, is not sufficient to support jurisdiction. 444 U.S. at 295-96. Nor can jurisdiction be based on the fact that the defendant benefited financially from some collateral relation with the forum state. *Id.* at 299. "Stream of commerce" jurisdiction arises only when "*the defendant's conduct and connection with the forum State* are such that he should reasonably anticipate being haled into court there." *Id.* at 297 (emphasis added). Thus, "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* at 298 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). There must be purposeful availment by the defendant.

The purposeful availment test measures the defendant's conduct and connections with the forum state, not the plaintiff's. This ensures notice and fairness: "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to

25

suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *Id.* at 297 (citation omitted) (quoting *Hanson*, 357 U.S. at 253).

The State's complaint failed to allege such conduct by Defendants in Washington. *See supra* Section II.A. The only connection the complaint alleged between Defendants and Washington stemmed from the unilateral activities of others in incorporating Defendants' CRTs into new end products for sale in Washington. The complaint does not allege that Defendants had any control over these activities. The State also did not rebut or challenge the declarations that Defendants submitted in support of dismissal that, for the most part, highlighted the absence of any contacts between Defendants and Washington. Most Defendants swore that they never sold any CRTs in Washington, never entered Washington, never hired employees in Washington, and never transacted any business in Washington. Based on these uncontroverted facts, Defendants did not purposefully avail themselves of the benefits of doing business in Washington.

Several of our sister and lower courts have come to the same conclusion. In *Holder*, plaintiffs sued foreign manufacturers for conspiring to fix the price of citric acid, which resulted in higher prices for District of Columbia consumers buying

26

products containing that ingredient. 779 A.2d at 267. The court applied the "stream of commerce" test and held that it lacked personal jurisdiction over the nonforum manufacturers. *Id.* at 269. To hold otherwise, the court explained, would be to find that the defendants could be haled into court anywhere in the world that a product containing any amount of citric acid produced by the defendants was ultimately sold. *Id.* at 267. Extending global jurisdiction to all component part manufacturers, the court found, would offend due process clause protections. *Id.*

The South Dakota Supreme Court applied the "stream of commerce" test and came to the same conclusion—no personal jurisdiction—on similar facts in *Frankenfeld.* 697 N.W.2d at 385-87. In *Frankenfeld*, plaintiffs alleged that out-of-state manufacturers conspired to fix the price of rubber processing chemicals and that the conspiracy caused South Dakota residents to pay supracompetitive prices for rubber tires (that were manufactured elsewhere with those chemicals but purchased in state). *Id.* at 380-81. The court found the defendants' connections to South Dakota were too attenuated to support jurisdiction because those defendants never delivered their products—the chemicals—into the stream of commerce with the expectation that they would be purchased by consumers in South Dakota, and indeed their products—the chemicals—were not purchased by South Dakotans. *Id.* at 386. Instead, direct purchasers used the defendants' products (chemicals) to

27

manufacture different products (tires) and those direct purchasers then sent those tires to South Dakota. *Id.* This was such an "extremely attenuated connection" that it could not support jurisdiction. *Id.* at 387.

The Kansas Supreme Court applied the same "stream of commerce" test and came to the same conclusion—that it lacked jurisdiction—in a similar antitrust case filed by indirect purchasers against manufacturers of rubber processing chemicals in *Merriman*. 282 Kan. at 470. Like the South Dakota court, the Kansas court based this decision on the fact that the manufacturer of plaintiff's tires did not operate in Kansas and that there was no indication that the defendants had any control over or collaboration with the tire manufacturers about where they marketed their tires. *Id.*

These cases illustrate that regardless of whether we apply the "effects" test for intentional acts articulated in *Calder* and *Walden* or the "stream of commerce" analysis articulated in *World-Wide Volkswagen*, the result is the same: Washington courts lack personal jurisdiction over any of Defendants, except the SDI Defendants.

III. THE MAJORITY ERRS IN IGNORING DEFENDANTS' DECLARATIONS

The majority reaches a contrary result in part by ignoring Defendants' declarations. Majority at 17-18.

28

The majority's approach is inconsistent with Washington cases stating that once the defendant files a CR 12(b)(2) motion challenging jurisdiction based on affidavits and discovery, the plaintiff must present evidence establishing a prima facie showing of jurisdiction. *See Precision Lab. Plastics, Inc. v. Micro Test, Inc.*, 96 Wn. App. 721, 725, 981 P.2d 454 (1999); *MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc.*, 60 Wn. App. 414, 418, 804 P.2d 627 (1991); *see also Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp.*, 172 Wn. App. 799, 807, 292 P.3d 147 (2013) ("Once challenged, the party asserting personal jurisdiction bears the burden of proof to establish its existence."), *aff'd*, 181 Wn.2d 272, 333 P.3d 380 (2014).

In fact, we have held that when the court considers matters outside the pleadings in ruling on a motion to dismiss for lack of personal jurisdiction, the court should treat the motion as one for summary judgment and view the facts in the light most favorable to the nonmoving party, not ignore all contrary facts as the majority does. *See Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 648 n.1, 649, 336 P.3d 1112 (2014), *cert. denied*, 135 S. Ct. 1904 (2015); *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 959, 334 P.3d 29 (2014); *Beaman v. Yakima Valley Disposal, Inc.*, 116 Wn.2d 697, 701 n.3, 807 P.2d 849 (1991); *see also Schumacher Painting Co. v. First Union Mgmt., Inc.*, 69 Wn. App. 693, 698,

850 P.2d 1361 (1993); *Carrigan v. Cal. Horse Racing Bd.*, 60 Wn. App. 79, 83 n.3, 802 P.2d 813 (1990); *Access Rd. Builders v. Christenson Elec. Contracting Eng'g Co.*, 19 Wn. App. 477, 481, 576 P.2d 71 (1978); *Puget Sound Bulb Exch. v. Metal Bldgs. Insulation, Inc.*, 9 Wn. App. 284, 288-89, 513 P.2d 102 (1973).

These decisions comport with the approach that the federal courts typically use when applying Fed. R. Civ. P. 12.[14] They permit a trial court to consider material outside the pleadings and to exercise discretion when deciding the proper procedure to resolve whether personal jurisdiction exists.[15]

---

[14] The Court of Appeals in this case declined to apply this analysis based on the additional language in our state rule, which provides that "'[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by rule 56.'" *State v. LG Elecs., Inc.*, 185 Wn. App. 394, 404, 341 P.3d 346 (emphasis omitted) (quoting CR 12(b)), *review granted*, 183 Wn.2d 1002, 349 P.3d 856 (2015). But the federal rule contains basically the same language in a slightly different spot at Fed. R. Civ. P. 12(d), so that supposed distinction fails.

[15] *See Toys "R" Us, Inc. v. Step Two, SA*, 318 F.3d 446, 456 (3d Cir. 2003) (explaining that although plaintiff bears the burden of demonstrating facts supporting personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the claim is clearly frivolous (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) and quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997))); *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (A defendant may move, before trial, to dismiss the complaint for lack of personal jurisdiction, and because there is no statutory method for resolving this issue, the mode of its determination is left to the trial court.); *Krepps v. Reiner*, 588 F. Supp. 2d 471, 479 (S.D.N.Y. 2008) ("In deciding a pretrial motion to dismiss for lack of personal

We applied essentially this analysis in *FutureSelect*, 180 Wn.2d at 959. In that case, we considered whether a New York defendant had sufficient minimum contacts with Washington to support personal jurisdiction. The trial court dismissed on the pleadings after holding a hearing; considering numerous pleadings, declarations, and briefs; and hearing arguments in favor of dismissal, including a CR 12(b)(2) argument. This court reversed, stating that "[a]t this stage of litigation, *the allegations of the complaint* establish sufficient minimum contacts to survive a CR 12(b)(2) motion. However, [defendant] may renew its jurisdictional challenge after appropriate discovery has been conducted." *Id.* at 963 (emphasis added). We explained that in some cases it may be appropriate for the trial court to delay ruling on a CR 12(b)(2) motion to allow for limited jurisdictional discovery: "Though we leave open [defendant]'s ability to renew its motion, we find the trial court dismissed prematurely. Some limited discovery and a resolution of disputed jurisdictional facts

---

jurisdiction, the Court has 'considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion.'" (quoting *Marine Midland Bank, NA v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))); *Allen v. Russian Fed'n*, 522 F. Supp. 2d 167, 181-82 (D.D.C. 2007) ("In contrast to a Motion to Dismiss brought under Fed.R.Civ.P. 12(b)(6), the Court need not treat all of Plaintiffs' allegations as true when determining whether personal jurisdiction exists over Defendants. Instead, the Court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.'" (quoting *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000))).

31

are warranted." *Id.* at 966. We directed the trial court on remand to permit jurisdictional discovery and, if necessary, hold a jurisdictional hearing to resolve any contested material facts. *Id.* at 972.

I acknowledge that we did not explicitly address whether the CR 12(b)(2) motion would essentially be converted to a CR 56 motion at that point. But we have addressed that question in the past, and we have said that the answer is yes. *See Beaman*, 116 Wn.2d at 701 n.3 ("Because the trial court received matters outside the pleadings, Valley's CR 12(b) motion to dismiss for lack of jurisdiction is treated on review as a summary judgment motion and the facts are viewed in the light most favorable to Beaman.").

The majority's decision to analogize the CR 12(b)(2) jurisdictional inquiry to the CR 8(a)(1) notice pleading inquiry strays from the approach of that prior precedent. Majority at 16-17. I would not stray from this approach, especially without any showing that it is incorrect and harmful. It allows the threshold jurisdictional question to be answered more quickly and efficiently. The trial court

therefore properly considered Defendants' declarations in ruling on jurisdiction. CP at 597.[16]

## CONCLUSION

The trial court lacked personal jurisdiction over all Defendants except the SDI Defendants. I would therefore reverse the Court of Appeals and reinstate the trial court's dismissal of the complaint with prejudice as to all but the SDI Defendants.

---

[16] The State did ask for jurisdictional discovery in response to Defendants' motions to dismiss. *See* CP at 226-27, 239-40, 252-53, 265-66; Pet. for Review at 125-26. The trial court denied that request, but it did so because the State had failed to explain what relevant facts it would seek that might contradict Defendants' declarations. Pet. for Review at 137-38. This is likely because the Defendants' declarations did not contradict the complaint's stream-of-commerce type allegations, but gave other relevant information. CP at 40-42, 56-64, 84-86, 104-06, 203-06. The trial court's decision seems well within its discretion: as both the majority and this dissent show, the jurisdictional question in this case is a legal question on essentially undisputed facts about the limited direct contacts between Defendants and this state.

McCloud, J.

Owens, J.

Madsen, C.J.