**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| KING COUNTY, a Washington municipal corporation,<br><br>            Respondent,<br><br>        v.<br><br>AQUATHERM GMBH, a German entity,<br><br>            Appellant,<br><br>        and<br><br>AQUATHERM L.P., a Delaware limited partnership; AETNA NA L.C. f/k/a AQUATHERM NA L.C., a Utah limited liability company, AQUATHERM INC., a Utah corporation, RIDGELINE MECHANICAL SALES, LLC, a Montana limited liability company, HARRINGTON INDUSTRIAL PLASTICS, INC., a Delaware limited liability company, WOOD HARBINGER INC., a Washington corporation, WG CLARK CONSTRUCTION CO., a Washington corporation, and AUBURN MECHANICAL INC., a Washington corporation,<br><br>            Defendants. | No. 85572-7-I (consolidated with No. 85595-6-I)<br><br>DIVISION ONE<br><br>ORDER GRANTING MOTION TO PUBLISH |

Appellant Aquatherm GmbH (Aquatherm) moved to publish the court's opinion

filed on February 2, 2026.  Appellant Anne Cohen joined Aquatherm's motion to publish.

Respondent King County filed an answer to the motion to publish and Aquatherm filed a reply.

The court has determined that the motion should be granted. Therefore, it is ORDERED that appellant's motion to publish the opinion is granted.

FOR THE COURT:

_____
Mann, J.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| KING COUNTY, a Washington municipal corporation, | No. 85572-7-I (consolidated with No. 85595-6-I) |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| AQUATHERM GMBH, a German entity, | |
| Appellant, | |
| and | |
| AQUATHERM L.P., a Delaware limited partnership; AETNA NA L.C. f/k/a AQUATHERM NA L.C., a Utah limited liability company, AQUATHERM INC., a Utah corporation, RIDGELINE MECHANICAL SALES, LLC, a Montana limited liability company, HARRINGTON INDUSTRIAL PLASTICS, INC., a Delaware limited liability company, WOOD HARBINGER INC., a Washington corporation, WG CLARK CONSTRUCTION CO., a Washington corporation, and AUBURN MECHANICAL INC., a Washington corporation, | |
| Defendants. | |

MANN, J. — King County sued Aquatherm GmbH (Aquatherm) and others

alleging that Aquatherm's green polypropylene pipe installed at the King County

Correctional Facility (KCCF), was defective. The complaint asserted violations of the Washington Product Liability Act (WPLA), ch. 7.72 RCW; the Consumer Protection Act (CPA), ch. 19.86 RCW; and a claim for breach of warranties. After a six-week trial, a jury awarded the County over $18 million.

Aquatherm appeals and challenges the trial court's rulings on personal jurisdiction and various discovery sanction orders. Aquatherm also argues that the trial court was biased. We affirm.

I

A

The County owns the KCCF located on 5th Avenue in Seattle. The KCCF regularly houses over 1,000 people. In 2008, the County determined that it needed to replace the domestic potable water pipes at the KCCF because of ongoing failures.

The County selected Aquatherm pipe for the project based on Aquatherm's representation about the pipe's suitability for the facility. Aquatherm pipe is manufactured by Aquatherm, a company located in Germany. Aquatherm pipe had been installed at other locations in Washington, including Swedish Hospital, the Via6 apartments at Sixth and Lenora, the Fred Hutchinson Building, and Virginia Mason Hospital.

Between 2011 and 2013, the County installed nearly six miles of Aquatherm pipe at the KCCF. Soon after the installation was completed, the pipes began to fail. Unknown to the County at the time, Aquatherm pipe had been experiencing failures around the world, including in Australia, Canada, and the Via6 apartments in Seattle. The County worked with Aquatherm to repair the ongoing and increasing pipe failures.

In 2019, the County retained Dr. Bryan Templeton, a metallurgist and materials engineer, to investigate the failures. Dr. Templeton determined that the failures were due to copper-catalyzed oxidation of the Aquatherm pipe. The County determined that all of the Aquatherm pipe was susceptible to failure. The County decided to perform an emergency repipe project to replace all of the Aquatherm pipe.

B

In March 2019, the County sued Aquatherm, several U.S. Aquatherm partners and distributors, and designers and contractors involved in the project. The lawsuit was filed in King County Superior Court and alleged violations of the WPLA, CPA, and breach of warranties.[1]

Aquatherm moved to dismiss the County's complaint for lack of personal jurisdiction in October 2019. The trial court denied Aquatherm's motion to dismiss without prejudice after determining that the facts alleged in the County's complaint satisfied its pleading burden under CR 12(b)(2). The court's order allowed Aquatherm to bring a future challenge to personal jurisdiction after February 3, 2020.

On April 11, 2023, less than a month before trial was set to begin, Aquatherm renewed its challenge to personal jurisdiction and moved for an evidentiary hearing on the issue. The trial court determined that because the evidence to be presented at trial would be duplicative of the evidence at an evidentiary hearing, it would conduct a bench trial on personal jurisdiction during the jury trial. The trial court ultimately determined that it had personal jurisdiction.

---

[1] The County's claims against the non-Aquatherm entities settled before trial.

Additionally, the trial court found on two occasions that Aquatherm engaged in discovery violations and entered sanction orders. The first discovery sanction concerned Aquatherm's failure to disclose the existence of a second recipe used in the Aquatherm pipe installed at the KCCF. In a parallel proceeding being litigated in King County concerning Aquatherm pipe failures at the Via6 apartments, Aquatherm offered testimony that there was only one recipe used for its plastic pipe sold in the United States and told the County in this case to rely on that testimony. The County eventually learned of the existence of a second recipe used in the pipe at the KCCF. The trial court concluded that Aquatherm violated the discovery rules by failing to disclose the second recipe, which the trial court concluded was willful and substantially prejudicial to the County. The court considered various sanctions but ultimately ordered that certain facts were deemed established and personally sanctioned one of Aquatherm's attorneys, Anne Cohen, $18,000.

Then, on the second to last day of testimony, one of Aquatherm's witnesses testified that it maintained samples of the pipe installed at the KCCF, which was not produced during discovery. The trial court found that Aquatherm engaged in another discovery violation and sanctioned Aquatherm $1.5 million. The court also personally sanctioned Cohen $5,000.

After a six-week trial, on June 29, 2023, the jury returned a verdict for the County finding that Aquatherm violated the WPLA and CPA. The jury awarded the County $18,063,850. The jury found for Aquatherm on the County's breach of warranties claim. On July 17, 2023, the trial court entered findings of fact and conclusions of law finding specific personal jurisdiction over Aquatherm.

-4-

Aquatherm appeals.

II

Aquatherm first argues that the trial court lacked personal jurisdiction over Aquatherm.

A

We begin by summarizing the trial court's findings of fact and conclusions of law addressing personal jurisdiction.

Aquatherm is the sole manufacturer of Aquatherm pipe and is headquartered in Attendorn, Germany. It is not domiciled or registered to do business in Washington and does not own or lease any real property in Washington.

The trial court found that Aquatherm formed and partnered with several U.S. entities to facilitate the sale of Aquatherm pipe. For example, in 2007, Aquatherm partnered with Aquatherm Inc., a Utah corporation, to expand its sales of Aquatherm pipe to the United States. Under the exclusive distribution agreement, Aquatherm assigned to Aquatherm Inc. the exclusive right to distribution of Aquatherm pipe throughout North America.

From January 2011 to December 2015, Aquatherm was in an exclusive distribution agreement with Aetna NA L.C. f/k/a Aquatherm NA. In December 2015, Aquatherm LP became the exclusive distributor of Aquatherm pipe in North America and remained as the exclusive distributor at the time of all related proceedings.

The trial court found that Aquatherm marketed and sold pipe through a manufacturer representative called Ridgeline Mechanical Sales (Ridgeline). The agreement with Ridgeline specified Washington as a territory for sales of Aquatherm

pipe. Ridgeline's owner testified that he understood Ridgeline's role was to represent Aquatherm as a manufacturer.

Aquatherm also distributed its pipe through Harrington Industrial Plastics (Harrington). For pipes installed at the KCCF, the County's installer placed its purchase order for Aquatherm pipe through Harrington. The supply agreement between Harrington and Aetna (Aquatherm's exclusive distributor at the time) provided that the purpose of the agreement was to increase sales of Aquatherm pipe in Washington.

The trial court found that at all times, the Aquatherm entities, including Aquatherm, sold, distributed, and marketed Aquatherm pipe under the generic brand name Aquatherm. The court also found that Aquatherm did not try to distinguish the entities and held themselves out to the public as Aquatherm. Moreover, the witnesses who testified to their interactions with the various Aquatherm entities explained that they understood the Aquatherm entities to be interrelated and referred to them as Aquatherm.

In May 2007, and in June 2009, the trial court found that Aquatherm contracted with Paschal Engineering & Forensic Consulting, LLC. James Paschal was the principal of this company and was to act as the primary contact for all product approvals and certifications of Aquatherm pipes in North America. In March 2012, Aquatherm entered a contract employee agreement with Paschal where he was to provide support regarding warranties and potential litigation issues.

The trial court found that Paschal acted as the point of contact in North America, including for the KCCF repipe project. For example, Aquatherm's managing director Dirk Rosenberg assured Ridgeline (the manufacturing representative) that they could

rely on Paschal. Paschal worked with Ridgeline and Wood Harbinger (the County's design consultant) during the KCCF project.

The trial court also found that Aquatherm represented that all of its pipe met all plumbing and water quality standards, including requirements imposed by the King County Department of Health. At some point, Aquatherm also petitioned to change the plumbing code so that plastic piping materials like Aquatherm pipe could be approved in Washington.

Ridgeline hosted "lunch and learn" seminars intended to generate sales of Aquatherm pipe in Washington. During a lunch and learn session, Ridgeline introduced Aquatherm pipe to Wood Harbinger. The trial court found Wood Harbinger received design guides and literature about Aquatherm pipe and identified Aquatherm as the manufacturer of the pipe.

The trial court found that Ridgeline and Aquatherm Inc. met directly with the County on several occasions to encourage the County to select Aquatherm pipe. Ridgeline and Aquatherm Inc. regularly updated Aquatherm on its solicitation of the KCCF project.

In November 2009, Aquatherm managing director Rosenberg visited Seattle and met with Wood Harbinger to discuss the KCCF project. Rosenberg discussed the KCCF project and why the existing pipe previously failed at the KCCF.

Aquatherm also offered a 10-year warranty on its pipe sold in Washington. The warranty did not contain a territorial limitation and protected against all property damage, financial loss, and personal injury arising from using Aquatherm pipe.

The trial court found that over the next two years Aquatherm, through its agents including Paschal, responded to the County and Wood Harbinger's request for additional information about Aquatherm pipe. For example, in response to the County's request, Paschal identified other projects at jails where Aquatherm pipe had been installed.

The trial court found that Aquatherm actively participated in the installation project at the KCCF from 2011 to 2013. For example, at the beginning of the project, Aquatherm directly shipped its pipe from its manufacturing plant in Germany to the KCCF after the County complained of delays. Paschal also regularly reviewed and commented on the installation at the KCCF.

Paschal regularly consulted with David Jacques, Wood Harbinger's primary engineer for the KCCF project, on the installation of pipes at the KCCF. Aquatherm invited Jacques to tour the Aquatherm manufacturing factory in Germany. Jacques subsequently spent several days in Germany touring the factory and meeting Aquatherm officers. This visit occurred while the project at the KCCF was ongoing.

At some point, there was an issue whether certain adapters used by the County's contractor, Auburn Mechanical, would be suitable, and Paschal sent a letter to Auburn Mechanical stating that the different adapters would not affect the receipt of the warranty. Paschal or Rosenberg answered various questions about the KCCF project and the warranty throughout the installation.

When the pipes began to fail at the KCCF, Aquatherm investigated the failures, and Paschal performed the product claim evaluations on behalf of Aquatherm. The trial court found that from 2014 to 2019, Paschal performed inspections, issued reports on

the failures, evaluated warranty work, sent samples from the KCCF to Germany, paid for contractors for repairs, and met with the County representatives about the failures.

Based on the above facts, the trial court made several conclusions of law. The trial court concluded that Aquatherm purposefully availed itself of the privilege of conducting business in Washington. The court reasoned that Aquatherm issued nine warranties directly to the County, which is sufficient to show a contractual relationship in Washington. The court noted that, while Aquatherm challenged the enforceability of the warranties, it never challenged that the warranties were in fact issued by Aquatherm.

The court also reasoned that Aquatherm authorized its agent, Paschal, to oversee the ongoing work related to the repair of the initial failures of the KCCF pipe. The court concluded that Paschal was doing warranty work on behalf of Aquatherm and rejected his testimony that the work was only "good faith" work. The trial court further reasoned that Aquatherm directed its business acts to King County when Aquatherm's managing director Rosenberg traveled to King County to meet with Wood Harbinger, the design consultant. The trial court also noted that Paschal regularly communicated with the County before, during, and after installation regarding Aquatherm's warranty. The court concluded that these contacts easily surpass the requisite "minimum contacts."

The trial court also concluded that Aquatherm's acts were purposeful and not "random, isolated, or fortuitous," that the County's claims arose out of or related to Aquatherm's contacts with Washington, and that Aquatherm did not meet its burden to prove that the exercise of personal jurisdiction would be unreasonable or unfair.

Accordingly, the trial court concluded that it could exercise personal jurisdiction over Aquatherm.

B

We review the trial court's findings of fact for substantial evidence. <u>Noll v. Special Elec. Co., Inc.</u>, 9 Wn. App. 2d 317, 321, 444 P.3d 33 (2019). We review de novo the trial court's conclusions of law on personal jurisdiction. <u>Failla v. Fixture One Corp.</u>, 181 Wn.2d 642, 649, 336 P.3d 1112 (2014).

"A court's exercise of personal jurisdiction over a nonresident defendant requires compliance with both the relevant state long-arm statute and the Fourteenth Amendment's due process clause." <u>Downing v. Losvar</u>, 21 Wn. App. 2d 635, 653, 507 P.3d 894 (2022) (citing <u>Daimler AG v. Bauman</u>, 571 U.S. 117, 137, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)). Washington's long-arm statute permits jurisdiction over:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:
>
> (a) The transaction of any business within this state;
>
> (b) The commission of a tortious act within this state.

RCW 4.28.185.

Our Supreme Court has consistently held that the state long-arm statute permits jurisdiction over foreign corporations to the extent permitted by the due process clause of the United States Constitution. <u>Downing</u>, 21 Wn. App. 2d at 654; <u>Noll v. Am. Biltrite, Inc.</u>, 188 Wn.2d 402, 411, 395 P.3d 1021 (2017); <u>Shute v. Carnival Cruise Lines</u>, 113 Wn.2d 763, 766-67, 783 P.2d 78 (1989). The due process clause of the Fourteenth

Amendment limits the power of a state court to assert personal jurisdiction over nonresidents of the state. Bristol-Myers Squibb Co. v. Superior Ct., 582 U.S. 256, 137 S. Ct. 1773, 198 L. Ed. 2d 395 (2017). "Because a state court's assertion of jurisdiction exposes defendants to the state's coercive power, personal jurisdiction falls within the parameters of the clause." Downing, 21 Wn. App. 2d at 655.

To comply with due process, three requirements must be satisfied: "(1) purposeful 'minimum contacts' must exist between the defendant and the forum state, (2) the plaintiff's injuries must arise out of or relate to those minimum contacts, and (3) the exercise of jurisdiction must be reasonable, that is, consistent with notions of 'fair play and substantial justice.'" Daniels v. Sommers, 32 Wn. App. 2d 482, 494, 556 P.3d 1113 (2024) (quoting State v. LG Elecs., Inc., 186 Wn.2d 169, 176-77, 375 P.3d 1035 (2016)). To establish sufficient minimum contacts, the defendant must take some action "by which it purposefully avails itself of the privilege of conducting activities within the forum state." Downing, 21 Wn. App. 2d at 662-63 (citing Walden v. Fiore, 571 U.S. 277, 284-85, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)). "The contacts between the nonresident defendant and the forum state must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." Duell v. Alaska Airlines, Inc., 26 Wn. App. 2d 890, 901, 530 P.3d 1015 (2023) (alteration in original) (internal quotations omitted) (quoting Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 359, 141 S. Ct. 1017, 209 L. Ed. 2d 225 (2021)). In contrast, purposeful availment does not exist when the contacts are "random, isolated, or fortuitous." Downing, 21 Wn. App. 2d at 663 (quoting Ford Motor, 592 U.S. at 359).

The plaintiff bears the burden to prove that there were purposeful minimum contacts with the forum state and that the plaintiff's injuries arise out of those minimum contacts. State v. AU Optronics Corp., 180 Wn. App. 903, 914-15, 328 P.3d 919 (2014). If the plaintiff meets that burden, the defendant must show that jurisdiction is not consistent with notions of fair play and substantial justice. AU Optronics, 180 Wn. App. at 914-15.

C

Aquatherm first asserts that its placing of pipes in the stream of commerce with knowledge that the County would purchase them does not establish purposeful availment. We disagree.

Generally, a foreign manufacturer does not purposefully avail itself when a sale in the forum state is an isolated occurrence or when the unilateral act of a third party brings the product into the forum state. LG Elecs., 186 Wn.2d at 177 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)). Further, "[t]he stream of commerce theory does not allow jurisdiction based on the mere foreseeability that a product may end up in a forum state." LG Elecs., 186 Wn.2d at 178 (citing World-Wide Volkswagen, 444 U.S. at 295-97). But "[d]esigning the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular advice to customers in the forum state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state entails purposeful availment." Downing, 21 Wn. App. 2d at 664.

Here, substantial evidence supports the trial court's conclusion that Aquatherm had more than mere knowledge that its products were in the stream of commerce and

could end up in Washington.  First, Aquatherm shipped some pipe directly from

Germany to Washington for the KCCF project.  Second, Aquatherm's managing director

Rosenberg traveled to Seattle to meet about the KCCF project.  Third, Aquatherm also

invited the lead engineer of the project to Germany to view the manufacturing of

Aquatherm pipes while the KCCF project was taking place.  Fourth, Ridgeline and

Aquatherm Inc. updated Aquatherm on the KCCF project while it was ongoing,

demonstrating that Aquatherm knew about the project at the KCCF.  Fifth, Aquatherm

was in contact with the project's installer about whether certain clamps could be used in

the installation and whether that would impact the warranty.  Sixth, Aquatherm, through

Paschal, worked on warranty repairs and investigated the pipe failures.  Seventh,

Aquatherm petitioned to change the Washington plumbing code, which demonstrates its

intention to purposefully avail itself of Washington's market.  These facts demonstrate

that Aquatherm did more than have mere knowledge that its products would end up in

Washington.

D

Aquatherm next asserts that the trial court erred in relying on the warranties to

find purposeful minimum contacts.  We disagree.

Aquatherm correctly notes that a contract, standing alone, between a

nonresident and a Washington corporation is generally insufficient to establish

jurisdiction.  See Freestone Cap. Partners L.P. v. MKA Real Estate Opportunity Fund I,

LLC, 155 Wn. App. 643, 653, 230 P.3d 625 (2010) (mere existence of a contract with a

Washington corporation is insufficient to establish personal jurisdiction).  Instead, the

court should also consider "[p]rior negotiations and contemplated future consequences,

-13-

along with the terms of the contract and the parties' actual course of dealing."
Freestone, 155 Wn. App. at 653.

Raymond v. Robinson, 104 Wn. App. 627, 15 P.3d 697 (2001) is instructive. There, the defendant company was an Arizona business that installed recreation vehicle accessories. Raymond, 104 Wn. App. at 631. The company had no officers, agents, or offices in Washington but advertised in magazines that reached the state. Raymond, 104 Wn. App. at 631-32. The plaintiff was a Washington resident that made a purchase with a one-year warranty after seeing the advertisement in a national magazine. Raymond, 104 Wn. App. at 631-32. At some point, issues arose with the purchase, and the company authorized additional repairs through the warranty and sent a tech from Arizona to Washington to do the repairs. Raymond, 104 Wn. App. at 632. After continued failures, the plaintiff sued the Arizona company under various theories including negligence and breach of contract. Raymond, 104 Wn. App. at 632. The company successfully moved to dismiss based on a lack of personal jurisdiction. Raymond, 104 Wn. App. at 632.

Division Two of this court reversed. The court reiterated that the "focus of [the minimum contacts inquiry] is on the quality and nature of RVI's activities in the state, rather than the number of acts within the state or some other mechanical standard." Raymond, 104 Wn. App. at 637 (emphasis added). The court reasoned the Arizona company actively initiated transactions through its advertisements in national magazines and by sending brochures to customers. Raymond, 104 Wn. App. at 638. The court also explained that the contacts significantly increased when it began performing warranty work in Washington and authorized a tech to come to Washington

-14-

to perform repairs. Raymond, 104 Wn. App. at 638. The court stated that by selling its products in Washington it knew its product would end up in the state, and the contacts extended at least as long as the warranty. Raymond, 104 Wn. App. at 640.

Here, like Raymond, Aquatherm knew that its product was in Washington and that it would have more contacts with the state at least as long as the warranty. And, like Raymond, the contacts began to increase when Paschal began performing and evaluating warranty work on behalf of Aquatherm. Further, Aquatherm answered questions about the installation and whether certain clamps would affect the receipt of the warranty. The actual course of dealing involved Aquatherm's agents regularly updating Aquatherm on the status of the contract.

Additionally, as the court noted in Raymond, the focus of the minimum contacts inquiry is the quality and nature of the contacts, not the numbers of acts. Therefore, Aquatherm's argument that a single visit from its managing director is insufficient and unpersuasive. Aquatherm actively worked on the KCCF project, shipped materials from its plant, visited the site, invited the County's designer to Germany, and authorized Paschal to complete warranty work. Accordingly, contrary to Aquatherm's assertion, there is more than only a contract between Aquatherm and the County. See also Aquatherm GmbH v. Renaissance Assocs. I Ltd. P'ship, 140 N.E.3d 349, 362 (Ind. Ct. App. 2020) (holding that the warranty between the plaintiff and Aquatherm supported finding personal jurisdiction because the warranty "necessitated [Aquatherm's] continued involvement with the end-user of its product").

E

Aquatherm next argues that its distribution contracts were insufficient to establish jurisdiction. We disagree.

Aquatherm relies on Montgomery v. Air Serv Corp., Inc., 9 Wn. App. 2d 532, 446 P.3d 659 (2019). There, the defendant was an airport services company incorporated in Georgia. Montgomery, 9 Wn. App. 2d at 535. The company offered a variety of services including wheelchair assistance, janitorial services, and cabin cleaning. Montgomery, 9 Wn. App. 2d at 535. The company had an affiliate location in SeaTac, but its services there did not include its wheelchair services. Montgomery, 9 Wn. App. 2d at 535.

A passenger booked a flight through Alaska Airlines from Seattle to Dallas and requested wheelchair service. Montgomery, 9 Wn. App. 2d at 536. The defendant company's name was not identified, and the passenger did not work with the company directly. Montgomery, 9 Wn. App. 2d at 535. When the passenger arrived in Dallas, the company provided wheelchair services, which ultimately resulted in the death of the passenger. Montgomery, 9 Wn. App. 2d at 536.

The passenger's estate filed a claim in King County for negligence against the airline services company. Montgomery, 9 Wn. App. 2d at 536. The estate argued that its claims arose from the distribution contracts with Washington through the third-party arrangements that the company had with airlines to provide wheelchair services in Dallas to Washington residents who fly to Texas. Montgomery, 9 Wn. App. 2d at 543. This court rejected the argument and held, "[p]roviding services in Texas does not manifest an intention to submit to the jurisdiction of Washington courts. And the

-16-

presence of third parties in Washington cannot substitute for the absence of a link between the forum and the defendant's wrongful act that gave rise to the claim." Montgomery, 9 Wn. App. 2d at 545.

The County asserts that Duell is instructive. There, a Washington resident purchased a flight from Alaska Airlines on the Alaska Airlines website. Duell, 26 Wn. App. 2d at 894. Alaska Airlines held a contract with PenAir—a Delaware corporation headquartered in Anchorage. Duell, 26 Wn. App. 2d at 894. PenAir did not own any property in Washington or operate any flights. Duell, 26 Wn. App. 2d at 894. Alaska Airlines had control over the operation of PenAir, including the pricing and marketing, schedule, and use of Alaska branding. Duell, 26 Wn. App. 2d at 894. The plane, operated by PenAir, crashed and killed the Washington resident, and the estate sued. Duell, 26 Wn. App. 2d at 894.

On appeal, PenAir argued that there was no personal jurisdiction because there was no purposeful availment since it did not own any property in Washington, employ any Washington citizens, operate flights in Washington, or conduct any operations in Washington. Duell, 26 Wn. App. 2d at 900. It also argued that there was no evidence that it advertised in Washington or otherwise solicited business from Washington residents. Duell, 26 Wn. App. 2d at 900.

This court disagreed, reasoning that PenAir exploited the market in Washington with its contract with Alaska Airlines and relied on Washington-based Alaska Airlines to exclusively market and sell PenAir's flights. Duell, 26 Wn. App. 2d at 901-02. Further, we explained that the choice of law provision in the contract indicated that Washington law would govern all matters of construction, validity, and performance. Duell, 26 Wn.

App. 2d at 903. Therefore, we reasoned that the choice of law provision was an example of how PenAir invoked the benefits and protections of Washington law. Duell, 26 Wn. App. 2d at 904. Accordingly, we held that PenAir purposefully availed itself in the state and could be held accountable for its misconduct. Duell, 26 Wn. App. 2d at 904.

This case is more like Duell than Montgomery. First, unlike Montgomery, Aquatherm's contracts with its subsidiaries were for the purpose of reaching Washington state and increasing sales here. The trial court also found that Aquatherm mandated that its subsidiaries use the Aquatherm name and all of its pipe identified it as Aquatherm. Further, Aquatherm contracted with Ridgeline, which serves territories in the Pacific Northwest, to be the manufacturing representative for sales in Washington. This is more like Duell, where the contract specifically provided for activities in Washington. Additionally, Aquatherm petitioned to change the plumbing code in Washington so that its plastic pipe could be approved. Aquatherm was availing itself of the benefits of Washington law.

Aquatherm makes several other arguments that many of the trial court's findings, standing alone, were insufficient to confer personal jurisdiction. But when reviewing the contacts as a whole, there is substantial evidence to support the trial court's conclusion that Aquatherm purposefully availed itself of Washington law. Aquatherm purposefully availed itself in Washington by working directly with the County, communicating about warranty work, shipping pipes directly from its plant in Germany, exploiting the Washington market, and working to expand the market in Washington.

-18-

For those reasons, the trial court did not err when it concluded that it had personal jurisdiction over Aquatherm.[2]

III

Aquatherm asserts that the trial court erred, both procedurally and substantively, when it issued two sanctions for discovery violations.

A

In July 2019, the County sought discovery for all records relating to the manufacturing and formulation of the Aquatherm pipes installed at the KCCF:

> **REQUEST FOR PRODUCTION NO. 20**: Produce copies of any and all documents of any nature that relate to the design, manufacture, construction, fabrication, assembly, and/or formulation of the type of Aquatherm Pipe installed at [the KCCF].

The County also sought discovery that the Aquatherm pipes complied with applicable governmental and industry standards and regulations:

> **INTERROGATORY NO. 24**: Identify all facts that support your affirmative defense that the product at issue at all times relevant complied with all applicable governmental and industry standards and regulations. The design specifications and condition met or exceeded all applicable local, state, and federal safety requirements and passed all required audits, testing, and plumbing codes at all times relevant, including but not limited to, for use in the potable water systems. The product was manufactured, marketed, furnished, supplied, and/or sold in conformity with the industrial and scientific state-of-the-art.

> **INTERROGATORY NO. 32**: Identify all facts that support your affirmative defense that the product at issue at all times relevant complied with all

---

[2] Aquatherm does not directly address in its opening brief the two other prongs of the personal jurisdiction test—whether the claims arose out of Aquatherm's contacts with Washington and whether the exercise of personal jurisdiction offends notions of fair play and justice. But we conclude that the claims, products liability, and contractual warranty, arise out of and relate to its contacts with Washington because the pipe failures related to Aquatherm's representation that the pipe was fit for the KCCF. Further, the County would not have suffered damages but for Aquatherm's manufacturing of a defective pipe. Lastly, the exercise of personal jurisdiction does not offend traditional notions of fair play and justice considering Aquatherm's contacts with Washington, and Aquatherm has not presented argument to the contrary.

applicable governmental and industry standards and regulations, and that the design specifications and condition of the product met or exceeded all applicable local, state, and federal safety requirements and passed all required audits, testing, and plumbing codes.

In October 2019, the County and Aquatherm conferred about discovery related to the formulation of Aquatherm pipe. For Aquatherm to produce the manufacturing information, Aquatherm stated that it needed the "print string" information—a list of codes on the pipe's exterior, which the County sent on October 23, 2019.

On November 1, 2019, Aquatherm produced over 20,000 pages of records and one document was entitled "confidential recipe information." This recipe is now referred to by the parties as AMB 10, but the document only referred to it as the recipe.

In December 2019, in the ongoing Via6 litigation, Aquatherm submitted testimony from multiple witnesses that there was only one formula for the Aquatherm pipe. Aquatherm directed the County to rely on the depositions in the Via6 litigation to understand the scope of their testimony in this case.

But unknown to the County at the time, when Aquatherm's quality assurance manager Ulrich Höffer ran the print string information of the pipes at the KCCF, he learned that there were two different recipes for the pipes used at the KCCF—AMB 10 and AMB 16. He later testified confirming that he had known of the AMB 16 recipe since late 2019 or early 2020 and had reported it to Aquatherm's counsel.

In August 2019, the County and Aquatherm selected pipe in situ for removal and sampling at the KCCF. The amount of Aquatherm pipe installed at the KCCF was almost six lineal miles, over 4,000 individual pieces, so testing could not be done on each piece. Accordingly, the parties engaged in a random sampling plan based on the

single AMB 10 recipe to obtain a representative set of pipe samples. Over the following months, the parties engaged in a joint examination and laboratory examination of the pipes, costing over $200,000. In September 2020, the County performed an emergency repipe project removing all Aquatherm pipe from the KCCF.

In October 2020, Aquatherm confirmed that it had provided all of the relevant manufacturing documents. But Aquatherm did not inform the County that there was a second recipe used in at least some of the pipe at the KCCF.

In September 2021, the County first learned of the potential existence of a second recipe when Aquatherm's expert Dr. Graeme George wrote in his report that certain pipes installed at the KCCF used an "alternative stabilization system." This report was the first time Aquatherm had mentioned the potential existence of another recipe.

On January 21, 2022, Aquatherm produced the second recipe, AMB 16, after Höffer created a new document that laid out the chemical composition of the pipe. The trial court found that AMB 10 and AMB 16 do not contain the same ingredients or type of ingredients, and AMB 16 lacks key ingredients including any primary antioxidants and metal deactivators, which are necessary to prevent oxidation (rotting) in the pipes. The trial court also found Aquatherm did not produce documents demonstrating that AMB 16 was certified by NSF.[3]

In February 2022, the County asked that Aquatherm cure various issues related to the nondisclosure of the second formula, including withdrawing one of its experts,

---

[3] NSF is an organization that certifies products for water and food applications.

supplementing discovery, and amending its answer. When the County eventually conferred with Aquatherm, its counsel stated that "[i]t is not our job to do your discovery." Aquatherm also threatened CR 11 sanctions against the County for not doing a proper investigation into the second formula.

On February 23, 2023, the County notified the trial court that it had a motion for discovery sanctions and asked whether it should file it as a motion in limine or have it calendared as a dispositive motion. The pretrial judge told the County to treat it as a motion in limine because it would be best decided by the trial judge.

On March 15, 2023, the County moved for partial summary judgment against the Aquatherm entities for the CPA claim. The County argued that since AMB 16 was not certified by NSF, it was a per se violation of the CPA. On March 31, 2023, the trial court denied summary judgment.

On April 11, 2023, the County moved in limine to remedy Aquatherm's discovery abuses for failing to timely disclose the AMB 16 recipe used in Aquatherm pipe. The County sought an inference that (1) pipe manufactured with AMB 16 was ubiquitous throughout KCCF, (2) it was in areas of the system under optimal conditions, and (3) it was installed in accordance with Aquatherm guidelines. Aquatherm opposed the motion arguing that there was only one formula but had multiple "alternative equivalents." Aquatherm further asserted that there was no existing document in its possession that it did not produce.

The trial court found that Aquatherm had a duty to disclose the existence of AMB 16—even before Höffer testified that the pipes in the KCCF were manufactured with AMB 16. The trial court concluded that Aquatherm's failure to mention the existence of

a second recipe in interrogatories related to certification and related to the recipe were evasive and misleading because NSF's certification of AMB 16 "was, at best, in serious doubt." The trial court noted that Aquatherm produced no authenticated document from NSF certifying the AMB 16 recipe for use in the greenpipes.

The trial court concluded that Cohen and Aquatherm deliberately withheld critical information and that the County was substantially prejudiced. The trial court considered several sanctions in its order—including default and the exclusion of witnesses. The court ultimately decided to issue a jury instruction that told the jury it is an established fact that AMB 16 was not certified by NSF and that pipes made with the AMB 16 recipe were distributed throughout the KCCF in equal proportion to those with AMB 10. The trial court also prohibited the defense from introducing evidence or argument that critiqued the work done by the County's experts.

The trial court also awarded the County its attorney fees and costs associated with (1) having to address the NSF certification issue pretrial, (2) bringing the sanctions motion, and (3) testing the greenpipes, including the deformulation testing. Finally, the trial court sanctioned Cohen personally $18,000, which was $1,000 for each month the information was withheld.

Aquatherm moved for reconsideration of the sanction order arguing that it timely disclosed the ingredients of AMB 16 through its production of manufacturing record documents for the masterbatches that were used to make the pipe. Aquatherm asserted that the documents included references to AMB 16 and provided the ingredient sheets for AMB 16.

The trial court rejected Aquatherm's arguments on reconsideration finding that the documents produced in November 2019 were not manufacturing documents but quality control documents. The court also found that the references to AMB 16 in that document production were meaningless because the first recipe (AMB 10, which was produced earlier) did not contain the words AMB. The court reasoned that references to AMB 16 with different ingredients was not an adequate disclosure that a second formula existed because Aquatherm put forth testimony in the Via6 litigation that there was only one formula and told the County to rely on those depositions. The trial court concluded that the sanctions remained.

B

On the second to last day of witness testimony, Höffer testified that Aquatherm maintains samples of every masterbatch in part for purposes of defending itself in litigation. During cross-examination, Höffer admitted that Aquatherm possessed masterbatch materials related to the Aquatherm pipe that was installed at the KCCF. His testimony further provided that Aquatherm had sample masterbatches for both AMB 10 and AMB 16, which they studied. He testified that he was unsure whether anyone asked him to provide those materials in discovery.

Aquatherm did not produce any physical materials in discovery, despite the following requests:

> **REQUEST FOR PRODUCTION NO. 11**: Produce all correspondence, reports, electronic communications, notations, memoranda, and any other documents of any nature that relate to quality control testing, analysis, and/or investigation performed by you in connection with the Aquatherm Pipe for the Project.

**REQUEST FOR PRODUCTION NO. 13**: Produce copies of any and all files, correspondence, notes, or other written or tangible materials, including those stored by electronic medium, which refer to or relate to any Aquatherm Pipe supplied by any entity for use in the Project, or any subsequent repairs to the Project.

**REQUEST FOR PRODUCTION NO. 14**: Produce copies of any and all files, correspondence, notes, or other written or tangible materials, including those stored by electronic medium, which refer to or relate to Aquatherm GmbH's role in producing, manufacturing, marketing, distributing, and/or selling any Aquatherm Pipe for use in the Project.

**REQUEST FOR PRODUCTION NO. 15**: Produce copies of any and all files, correspondence, notes, or other written or tangible materials, including those stored by electronic medium, which refer to or relate to the quality, longevity, compatibility, suitability, performance, and/or other benefits or characteristics of the type of Aquatherm Pipe installed at the Project.

The County moved for sanctions for Aquatherm's failure to produce the sample masterbatch resin related to the pipe installed at the KCCF. The County sought default judgment as to the County's claim against Aquatherm under the CPA. The County also sought all its fees and costs related to its experts, which totaled $1.85 million. In response, Aquatherm argued that the County never requested that Aquatherm search for or produce masterbatch samples.

The trial court issued its second discovery sanctions order after the trial. The court sanctioned Aquatherm $1.5 million and awarded attorney fees to the County for bringing the motion. The court also imposed a $5,000 personal sanction against Cohen.

C

Aquatherm contends that the County's interrogatories were overly broad and are "blockbuster interrogatories" that are disfavored by courts. Aquatherm argues that the

-25-

County needed to specifically ask for the chemicals and formulations used in the jail. Aquatherm also asserts that it was never requested to produce the samples of the masterbatch. We disagree.

The scope of discovery is broad. Cedell v. Farmers Ins. Co. of Wash., 176 Wn.2d 686, 695, 295 P.3d 239 (2013). "The right to discovery is an integral part of the right to access the courts embedded in our constitution." Cedell, 176 Wn.2d at 695. As our Supreme Court has explained:

> Besides its constitutional cornerstone, there are practical reasons for discovery. Earlier experiences with a "blindman's bluff" approach to litigation, where each side was required "literally to guess at what their opponent would offer as evidence," were unsatisfactory. Michael E. Wolfson, Addressing the Adversarial Dilemma of Civil Discovery, 36 CLEV. ST. L. REV. 17, 22 (1988). As modern day pretrial discovery has evolved, it has contributed enormously to "a more fair, just, and efficient process." Id. at 20. Effective pretrial disclosure, so that each side knows what the other side knows, has narrowed and clarified the disputed issues and made early resolution possible. As importantly, early open discovery exposed meritless and unsupported claims so they could be dismissed. It is uncontroverted that early and broad disclosure promotes the efficient and prompt resolution of meritorious claims and the efficient elimination of meritless claims.

Cedell, 176 Wn.2d at 695 (quoting Lowy v. PeaceHealth, 174 Wn.2d 769, 777, 280 P.3d 1078 (2012)).

CR 26(g) requires that attorneys responding to requests certify that they have read the response, and after reasonable inquiry, believe it is consistent with the discovery rules. Whether an attorney made a reasonable inquiry is judged by an objective standard. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 343, 858 P.2d 1054 (1993). "In determining whether an attorney has complied with the rule, the court should consider all of the surrounding circumstances,

the importance of the evidence to its proponent, and the ability of the opposing party to formulate a response or to comply with the request." Fisons, 122 Wn.2d at 343. Additionally, under CR 26(e)(2)(B), litigants have a duty to timely supplement discovery responses when a response previously made is no longer true.

CR 37 allows a trial court to impose sanctions against a party who fails to comply with a discovery order. "The purpose of sanctions orders are to deter, to punish, to compensate[,] and to educate." Fisons, 122 Wn.2d at 356. We review a trial court's order of discovery sanctions for abuse of discretion. Barton v. Dep't of Transp., 178 Wn.2d 193, 214-15, 308 P.3d 597 (2013). "'[D]iscretionary determination[s] should not be disturbed on appeal except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997) (quoting Associated Mortg. Invs. v. G.P. Kent Constr. Co., 15 Wn. App. 223, 229, 548 P.2d 558 (1976)). "The abuse of discretion standard . . . recognizes that deference is owed to the judicial actor who is 'better positioned than another to decide the issue in question.'" Fisons, 122 Wn.2d at 339 (internal quotation marks omitted) (quoting Cooter & Gell v. Hartmax Corp., 469 U.S. 384, 403, 110 S. Ct. 2447 110 L. Ed. 2d 359 1990)).

In Fisons, the defendant drug company continually refused to produce documents during discovery. 122 Wn.2d at 346. The plaintiff sought documents relating to the defendant's knowledge of the danger of the drug that allegedly harmed the plaintiff. Fisons, 122 Wn.2d at 347. The defendant drug company avoided producing the documents by giving evasive and misleading responses in discovery. Fisons, 122 Wn.2d at 346. A few years into the litigation, an anonymous source sent

two "smoking gun" documents to the plaintiff's attorney, which proved the drug company knew of the dangers of the drug at least four years before the plaintiff's injury. Fisons, 122 Wn.2d at 336-37.

The defendant justified its nondisclosure by asserting that (1) it produced all relevant documents, (2) it did not produce the two smoking gun documents because the plaintiffs did not specifically ask for the documents, and (3) discovery is adversarial and good lawyering required the responses made in the case. Fisons, 122 Wn.2d at 352-53. Our Supreme Court rejected each argument. The court explained, in relevant part:

> [T]he discovery rules do not require the drug company to produce only what it agreed to produce or what it was ordered to produce. The rules are clear that a party must fully answer all interrogatories and all requests for production, unless a specific and clear objection is made. If the drug company did not agree with the scope of production or did not want to respond, then it was required to move for a protective order. In this case, the documents requested were relevant. The drug company did not have the option of determining what it would produce or answer, once discovery requests were made.
> . . . .
> . . . the drug company further attempts to justify its failure to produce the smoking guns by saying that the requests were not specific enough. Having read the record herein, we cannot perceive of any request that could have been made to this drug company that would have produced the smoking gun documents

Fisons, 122 Wn.2d at 353-54.

The court also concluded that the discovery responses were misleading and inconsistent with the spirit and purpose of the discovery rules. Fisons, 122 Wn.2d at 352. The court explained, "[t]he concept that a spirit of cooperation and forthrightness during the discovery process is necessary for the proper functioning of modern trials." Fisons, 122 Wn.2d at 352.

Like the defendant in Fisons, Aquatherm asserts that the County's requests were not specific enough. But, in Fisons, there was likely no request that could have been made which would have prompted Aquatherm to produce the documents. The County specifically requested all documents and records relating to certifications, but Aquatherm only broadly responded that all of its pipes were state of the art and met all the applicable standards. As the trial court found, this response was evasive because there was serious doubt that AMB 16 was certified for use in domestic water systems. Additionally, the crux of the case dealt with the formulation of the pipes to determine the cause of the failure. When Aquatherm learned that the pipes at the KCCF were manufactured with a second recipe, it had a duty to supplement its responses and inform the County. Finally, if Aquatherm did believe the requests were improper or overly broad, then it should have sought a protection order—which it did not. See Fisons, 122 Wn.2d at 353-54.

Next, Aquatherm did not adequately disclose the second recipe in its production in November 2019. As the trial court concluded, those thousands of pages of documents were not manufacturing documents but quality control documents. Additionally, the term "AMB" was meaningless at the time of the document production. The first recipe initially produced did not refer to it as AMB 10 but rather as "confidential recipe information." Moreover, Aquatherm put forth testimony in the Via6 matter that there was only one formula and directed the County to rely on the testimony from the Via6 case—meaning the County relied on the testimony that there was only one formula.

We reject Aquatherm's argument that the County did not ask for masterbatches for the same reasons. There is no dispute that there were no tangible materials produced. The County specifically requested any tangible materials related to quality control, manufacturing, and the pipes installed at the KCCF. Höffer testified that Aquatherm maintained masterbatch samples for quality control for at least 10 years. These samples were directly responsive to the County's requests, and Aquatherm violated the discovery rules by not producing the samples.[4]

For these reasons, the trial court did not abuse its discretion when it concluded that Aquatherm violated discovery rules.

D

Aquatherm also argues that the trial court's sanctions were unjustified and unconstitutional.

CR 26(g) requires the court to impose sanctions once it has determined that a party violated the rule, but the trial court has "wide latitude" to fashion appropriate sanctions. Fisons, 122 Wn.2d at 355. Fisons provides principles to guide a trial court's decision:

> First, the least severe sanction that will be adequate to serve the purpose of the particular sanction should be imposed. The sanction must not be so minimal, however, that it undermines the purpose of discovery. The sanction should insure that the wrongdoer does not profit from the wrong. The wrongdoer's lack of intent to violate the rules and the other party's

---

[4] Aquatherm also argues that the trial court applied the wrong legal standard that amounted to an independent duty of disclosure. We disagree. The legal system cannot succeed without full cooperation of the parties, so courts have authority to use sanctions to deter unjustified and unexplained resistance to discovery. Henderson v. Thompson, 200 Wn.2d 417, 441, 518 P.3d 1011 (2022). The trial court did not require an independent duty of disclosure. Aquatherm was aware of the importance of the formulas and the differing ingredients. Henderson, 200 Wn.2d at 443. Aquatherm's conduct was inconsistent with the discovery rules and was the precise type of conduct that Fisons disapproved.

failure to mitigate may be considered by the trial court in fashioning sanctions.

122 Wn.2d at 355-56.

CR 37(b) provides a nonexclusive list of possible sanctions, including designating facts as established, striking claims or defenses, limiting or prohibiting evidence, default, and contempt.  To support more severe sanctions, the record must clearly show: "(1) one party willfully or deliberately violated the discovery rules and orders, (2) the opposing party was substantially prejudiced in its ability to prepare for trial, and (3) the trial court explicitly considered whether a lesser sanction would have sufficed."  Barton, 178 Wn.2d at 215.  A Burnet analysis is required for remedies such as dismissal, default, and exclusion of testimony—sanctions that may affect a party's ability to present its case—but a Burnet analysis is not required for monetary, compensatory sanctions under CR 26(g) and CR 37(b)(2).  Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 690, 132 P.3d 115 (2006).

1

Aquatherm asserts that the County failed to mitigate its damages and did not meet its burden to prove it was substantially prejudiced.  We disagree.

The test for prejudice looks to whether the opposing party was substantially prejudiced in preparing for trial.  Magaña v. Hyundai Motor Am., 167 Wn.2d 570, 589, 220 P.3d 191 (2009).  When reviewing a court's findings of prejudice, we do not substitute our discretion for that of the trial court.  Magaña, 167 Wn.2d at 590.

The trial court found that the County was substantially prejudiced in its ability to prepare for trial because of the amount of time, energy, and money that was spent

investigating the pipe failures while the second recipe was not disclosed. As mentioned, the County conducted an in situ testing project of the pipes, on the belief that there was only one recipe. The trial court added that the County was prejudiced by investigating AMB 16's certification with NSF and that it took time and attention away from other issues in the case.

Aquatherm relies on Carroll v. Akebono Brake Corp., 22 Wn. App. 2d 845, 514 P.3d 720 (2022), for the proposition that the County failed to mitigate its damages. The issue in that case was whether the plaintiff committed sanctionable discovery violations when it did not disclose the existence of an autopsy report in a wrongful death case. Carroll, 22 Wn. App. 2d at 887. The plaintiffs had testified in depositions that they were unsure if there was an autopsy report. Carroll, 22 Wn. App. 2d at 889-90. This court concluded that the defendants did not mitigate any prejudice resulting from the testimony because it did not conduct further inquiry into whether any other family members were aware of the autopsy report. Carroll, 22 Wn. App. 2d at 891-92. Therefore, this court concluded that the trial court abused its discretion in imposing a severe sanction because the defendants did not mitigate its prejudice. Carroll, 22 Wn. App. 2d at 892.

Carroll is unpersuasive. Here, the majority of the prejudice suffered by the County resulted from the random sampling it conducted in situ of the pipes. The County conducted this analysis based on the belief that there was only one recipe. Accordingly, the County could not test any of the pipes in situ with the AMB 16 formula to determine whether there were other aspects that could have contributed to the failure of the pipe. The County could not mitigate any prejudice at this point because the repiping project

had been completed. Moreover, when the County attempted to first address the nondisclosure of the second recipe, Cohen threatened CR 11 sanctions asserting that the County's claims were unfounded. Therefore, any delay in the County moving for sanctions was because it continued to investigate the nondisclosure and certification issue.

For those reasons, the trial court did not err in concluding that the County was substantially prejudiced.

2

Aquatherm argues that it did not willfully withhold information. We disagree.

In Magaña, our Supreme Court held that where a party disregards a discovery order without providing a reasonable excuse or justification, such disregard is willful. 167 Wn.2d at 584. But the court has clarified that "the willfulness prong would serve no purpose 'if willfulness follows necessarily from the violation of a discovery order.'" Jones v. City of Seattle, 179 Wn.2d 322, 345, 314 P.3d 380 (2013) (quoting Blair v. Ta-Seattle E. No. 176, 171 Wn.2d 342, 350 n.3, 254 P.3d 797 (2011)). But "[w]hen the court finds intent to spoil or hide evidence . . . the more severe sanctions would be appropriate." Henderson, 200 Wn.2d at 445.

The trial court also made findings addressing willfulness. The trial court noted that Cohen learned of the second recipe in late 2019 but did not take corrective action in the Via6 case to inform counsel or the court that there may have been two recipes— although it was a question in the Via6 case whether there had been two recipes. The trial court found that the lack of action to correct or supplement the testimony in the Via6 case demonstrates that Aquatherm had something to hide. The trial court also found

-33-

that Aquatherm gained a tactical advantage by not disclosing that some pipes were made with a different recipe. And the court found it relevant that Cohen informed the County in October 2020 that Aquatherm had produced all relevant documents, but this answer was misleading because by this time Cohen knew of the existence of a second recipe. Lastly, the court found that Aquatherm was seeking to weaponize its nondisclosure by criticizing the work of the County's experts during discovery.

Substantial evidence supports the trial court's conclusion that the violation was willful. There was no justification for the nondisclosure. Additionally, the reasons Aquatherm has stated for its nondisclosure have changed over time—from there were not two recipes because they were functionally equivalent, to Aquatherm did produce the recipe, to now on appeal that the interrogatories were overly broad and the County did not specifically ask for the chemicals or masterbatches. Cohen also represented Aquatherm, and all the related entities, and was personally aware of the existence of the second recipe. The trial court was acting in its discretion in concluding that both Cohen and Aquatherm willfully violated the discovery rules.

E

Aquatherm argues that the trial court's issuance of jury instruction 5 was an excessive sanction. We disagree.

The trial court issued the following instruction as a sanction:

For purposes of your deliberations, you are to accept the following facts as being established as true:

1) Aquatherm greenpipe manufactured using the AMB 16 formulation was not certified by NSF under any NSF standards, including NSF 14 and NSF 61.

-34-

2) Aquatherm greenpipe manufactured using AMB 16 formulation was distributed through the King County Correctional Facility in equal proportion to Aquatherm greenpipe manufactured using the AMB 10 formulation and not contained only in the cold-water portions of the KCCF.

The "sanction should be proportional to the discovery violation and the circumstances of the case." Magaña, 167 Wn.2d at 590. CR 37(b)(2)(A) allows a trial court to treat designated facts as established. But an adverse jury instruction is appropriate only if the party's failure to preserve or produce evidence was intentional or in bad faith. Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC, 26 Wn. App. 2d 319, 353, 527 P.3d 134 (2023).

Aquatherm argues that the instruction was a comment on the evidence. We disagree. CR 37 allows the court to treat facts as established. A jury instruction stating certain facts as established was appropriate because, as discussed above, Aquatherm's violation of the discovery rules was willful. This jury instruction was well within the range of permissible sanctions. The trial court weighed the violation and possible sanctions. Aquatherm does not cite to any cases where an adverse jury instruction was a comment on the evidence. While the case law is relatively limited, federal counterparts have held that establishment of facts as sanctions is appropriate. See generally Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 709, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982) (holding that the sanction of taking certain facts as established may be applied to support finding of personal jurisdiction over defendant without violating due process); Hilao v. Est. of Marcos, 103 F.3d 762, 766 (9th Cir. 1996) (holding that the sanction of holding facts in a complaint as established was proper); Chilcutt v. United States, 4 F.3d 1313, 1325 (5th Cir. 1993)

(holding that the government's failure to comply with discovery and deceit about its noncompliance warranted sanction that plaintiff's prima facie case for liability was established).

The jury instruction was well within the permissible choices, and it was not as severe as a default judgment or disqualification of counsel, which the trial court noted would have also been appropriate.  The trial court did not abuse its discretion in issuing this sanction.

F

Aquatherm next asserts that the trial court's $1.5 million sanction was unconstitutionally severe.  We disagree.[5]

In its order for reconsideration, the trial court addressed Aquatherm's argument that the monetary sanction was unconstitutionally severe.  First, the trial court rejected the argument that the sanction was punitive in nature because (1) discovery sanctions are not damages, and (2) the sanctions were compensatory in nature because they were designed to compensate the County for having to go to trial on its WPLA and CPA claims because if the court had known about the second violation it would have issued default.  The trial court also rejected Aquatherm's argument that the sanction award violated the Eighth Amendment excessive fine prohibition.  The trial court reasoned that a discovery sanction is not a fine for purposes of the Eighth Amendment, but even if it was, it is not grossly disproportionate to its misconduct.

---

[5] Aquatherm also asserts that the trial court's award of attorney fees as sanctions was excessive. But other than argue that the court issued multiple sanctions, it offers no authority or reviewable argument in support of its claim.

Aquatherm makes a similar argument on appeal: that the sanction was punitive in nature and violated due process. We disagree. The second discovery violation occurred on the second to last day of trial. At that point, there were not many sanctions that the trial court could levy to "educate, deter, and compensate." Fisons, 122 Wn.2d at 356. The trial court exercised its discretion in imposing a monetary sanction that was substantial enough to impact a large company like Aquatherm. Additionally, although a Burnet analysis is not required for a pure monetary sanction, the trial court considered other sanctions like a directed verdict, but the trial was nearly concluded. The monetary sanction was well within the discretion of the trial court.

G

Cohen argues separately that she was sanctioned without due process because the trial court did not notify counsel that it was considering sanctioning her personally. We disagree.

In the first sanctions order, the trial court found that Cohen and Aquatherm willfully violated the discovery rules. The court concluded:

> [T]he Court also finds that a personal sanction against Ms. Cohen is appropriate. Such a direct sanction will educate Ms. Cohen about the perils of tinkering with the discovery process and intentionally secreting information, will hopefully deter her from engaging in similar behavior in the future, and will punish her for her actions. Ms. Cohen is ordered to pay . . . $18,000 ($1,000 a month for each month she withheld critical information) to the King County Bar Association.

On reconsideration, the trial court considered a declaration Cohen filed explaining what she knew about the second recipe. Cohen noted in her declaration that she learned of AMB 16 during a phone call with Dr. George and that Dr. George's report stated that some pipe in the KCCF was manufactured with an alternate stabilization

system was sufficient disclosure. The trial court found that Cohen's declaration was not credible and even if it were, Cohen had an obligation to inform the County about the second formula and the specific contents of the formula. Accordingly, the trial court concluded that Cohen intentionally withheld information and upheld the $18,000 sanction.

For the second sanctions order, the trial court sanctioned Cohen $5,000 personally because she certified the answers to Aquatherm's discovery responses in violation of the certification requirement.

Cohen cites no authority for the contention that due process required the trial court to notify counsel that it was considering personal sanctions. Even if the court was required to notify Cohen that it was considering personal sanctions, the trial court still reconsidered its order at the request of Cohen and considered her declaration. Therefore, Cohen still had an opportunity to be heard following notice of the court's sanctions ruling.

Accordingly, the trial court did not abuse its discretion in personally sanctioning Cohen.

IV

On August 4, 2023, over a month after the jury verdict, Aquatherm moved for recusal of the trial judge for the remaining posttrial proceedings. Aquatherm argued that a reasonable observer could have perceived bias favoring the County. The trial court denied the motion to recuse and later denied reconsideration of that order. Aquatherm also unsuccessfully moved under CR 59 for a new trial alleging that the trial court's treatment of defense counsel illustrated bias and partiality to the County.

Aquatherm argues that the trial court erred in denying its motion for recusal and for a new trial under CR 59 because the trial court acted in a biased fashion. Aquatherm's attorney, Cohen, argues in a separate brief, joined by Aquatherm, that the trial court exhibited gender bias toward her and the all-female defense team.

A

In her brief, Cohen cites to instances of exchanges with the trial court that demonstrate gender bias. First, during argument on Aquatherm's motion for reconsideration of the first discovery sanctions order, Cohen sought to submit an ex parte declaration:

> THE COURT: . . . I wanted to discuss Ms. Cohen's motion to file something ex parte. So Ms. Cohen, you heard the Court's questions yesterday, you've had an opportunity to review the County's submission. What are your thoughts?
> MS. COHEN: So your Honor, the County's submission speaks entirely to attorney/client privilege, which I don't think is what's at issue here. I think the County is making assumptions about the kind of—
> THE COURT: Why don't you quit being coy and just get the point. What is at issue here? What do you want me to say in this declaration? Make some offer of proof because you want me to grant some fairly extraordinary relief without telling me what it is you want to say.
> MS. COHEN: I was just about to tell you.
> THE COURT: Well, just get to the point.

Second, during a colloquy at the end of the same day the parties and the court discussed a demonstrative exhibit proposed by Aquatherm.

> THE COURT: . . . I heard something about a potential demonstrative that might be pretty large, might not fit through the door?
> MS. HSU: Your honor, with respect to the demonstrative, I know it will fit through a door . . .
>        . . . .
> THE COURT: Is it a model?
> MR. THOMSEN: That apparently is what it is.
> THE COURT: Like Barbie Dream Jail or something?
> MS. COHEN: Exactly right, your Honor.

THE COURT: That's interesting to see. But take a look at it, and if there are any objections we'll deal with it. Okay. All right. Anything else that we want to address?

Cohen also cites a later colloquy outside the presence of the jury when one of Aquatherm's counsel asked the County's counsel if they would stipulate that one of the pipe formulas, AMB 10, was a safe product and the trial court interjected that it was a "silly question." Cohen also cites various times the court interrupted her or her team. She cites one instance that is not transcribed in the record and states that there are many other examples, but there are too many citations to provide. Cohen also provided an audio appendix with excerpts from the trial that she asserts convey the trial court's bias.

B

"Due process, the appearance of fairness, and Canon 3(D)(1) of the Code of Judicial Conduct require disqualification of a judge who is biased against a party or whose impartiality may be reasonably questioned." Wolfkill Feed and Fertilizer Corp. v. Martin, 103 Wn. App. 836, 841, 14 P.3d 877 (2000). "[A] judicial proceeding is valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). We review a trial court's decision whether to recuse for an abuse of discretion. West v. Wash. Ass'n of County Officials, 162 Wn. App. 120, 137, 252 P.3d 406 (2011).

We begin with the presumption that a trial judge acted without bias or prejudice. Tacoma S. Hosp., LLC v. Nat'l Gen. Ins. Co., 19 Wn. App. 2d 210, 218, 494 P.3d 450 (2021). To overcome this presumption, the party raising the challenge must provide

specific facts establishing bias. Tacoma S. Hosp., 19 Wn. App. 2d. at 218. Generally, judicial rulings alone do not demonstrate bias. West v. Wash. State Ass'n of Dist. & Mun. Ct. Judges, 190 Wn. App. 931, 943, 361 P.3d 210 (2015) (citing In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004)).

Courts generally will conclude that the appearance of fairness doctrine is not violated based on isolated comments or incidents. For example, in In re Disciplinary Proceeding Against Haskell, 136 Wn.2d 300, 314-16, 962 P.2d 813 (1998), an attorney argued on appeal that a hearing officer was biased because the officer "grill[ed]" one of her witnesses about "false documents" and requested that the witness retrieve accounting records to refresh her recollection. The Supreme Court held the comments were not improper but even if they were

> [the comments] were isolated incidents that took place in a lengthy hearing and did not detract from the overall fairness of the proceeding . . . [T]he hearing lasted nine days and it generated over 2,000 pages of transcript. Although there may be instances where a single incident or comment may be sufficient to lead a reasonably prudent person to believe a proceeding is unfair, the two incidents that have been called to our attention are not significant enough, when viewed in isolation or against the whole record, to justify a new hearing. Malave-Felix v. Volvo Car Corp., 946 F.2d 967, 973 (1st Cir. 1991) ("Charges of bias should not be based on a few isolated comments, but rather on the record as a whole.").

Haskell, 136 Wn.2d at 317. But cf. State v. Lemke, 7 Wn. App. 2d 23, 434 P.3d 551 (2018) (reversing the trial court when the trial judge used profane and disparaging language to the defendant).

C

At the outset, we agree with Aquatherm and Cohen that calling counsel "coy," a question "silly," or deriding a proposed exhibit by comparing it to a toy, is not

appropriate conduct with any attorney or party. But, as in Haskell, the isolated incidents cited took place during a lengthy six-week jury trial and in response to what the trial court concluded were serious discovery violations. Moreover, during the course of the lengthy contentious trial, the trial court also interrupted plaintiffs' counsel who was male. After reviewing the record as a whole, and the supplemental recording offered by Cohen, we cannot conclude that Cohen and Aquatherm have met their burden to show that the trial court exhibited gender bias to the extent it interfered with Aquatherm receiving a fair trial. While isolated comments may have been inappropriate, in reviewing the record as a whole, it is clear that it was a hotly contested trial and the trial court was frustrated by Aquatherm's discovery abuses. It appears more likely that the comments demonstrated frustration and a rejection of Aquatherm's legal argument and not gender bias.

D

Aquatherm also points to other instances that it claims demonstrate the trial court's bias. For example, Aquatherm complains that the trial court considered sanctions while the trial was ongoing. But Aquatherm did not request anything different, and the trial court continued to notify parties that it was working on its ruling. Moreover, a prior judge assigned to a pretrial conference explicitly instructed the County to file its motion for discovery sanctions as a motion in limine before the trial judge and Aquatherm did not object. Additionally, as the County notes, the trial court issued its ruling over a week before Aquatherm began its case in chief, so it had time to alter its trial strategy if needed.

Aquatherm also asserts that the trial court improperly ruled on personal jurisdiction after trial. But Aquatherm did not renew its objection to personal jurisdiction until a month before trial. CR 12(d) permits courts to defer the determination of personal jurisdiction until trial as follows:

> (d) Preliminary Hearings. The defenses specifically enumerated (1)-(7) in section (b) of this rule, whether made in a pleading or by motion, and the motion for judgment mentioned in section (c) of this rule shall be heard and determined before trial on application of any party, <u>unless the court orders that the hearing and determination thereof be deferred until the trial.</u>

(Emphasis added.) Accordingly, the trial court had authority to make the determination during trial because the civil rule does not mandate that jurisdiction be determined before trial. Because the testimony would have overlapped and Aquatherm was amenable to deciding the issue during trial, this is not grounds for reversal.

Aquatherm points also to the trial court taking formal objections to jury instructions after the verdict as evidence of bias. But the parties agreed to formally object to jury instructions after the verdict, so this alleged trial irregularity is of no avail. Even if it was error for the trial court to wait until after the case went to the jury, the error was harmless because Aquatherm does not challenge any of the instructions on appeal. Therefore, any trial irregularities either were acquiesced to by Aquatherm or did not prejudice its ability to present its case.

Aquatherm further argues that the trial court exhibited bias by expressing partiality to the County by interrupting counsel, advancing arguments that the County did not present, issuing sanctions, and handling objections in a partisan manner. We disagree. First, many of the instances cited by Aquatherm occurred outside the jury's

presence.  Second, Aquatherm does not present argument on how any of the alleged bias impacted the trial.  In fact, the jury did not award the County all that it was asking and found for Aquatherm on the breach of warranties claim.  Third, the trial judge did often interrupt counsel—but it interrupted both sides.  Lastly, Aquatherm did not move for recusal until long after the jury rendered its verdict, suggesting that it did not feel that any alleged bias was affecting the trial while it was ongoing.  State v. Blizzard, 195 Wn. App. 717, 725-26, 381 P.3d 1241 (2016) ("Delaying a request for recusal until after the judge has issued an adverse ruling is considered tactical and constitutes waiver.").

Further, even if the jurors observed any hostile exchange between Aquatherm's attorneys and the trial judge, the following jury instruction cured any resulting prejudice:

> One of my duties has been to rule on the admissibility of evidence.  Do not be concerned during your deliberations about the reasons for my rulings on the evidence.  If I have ruled that any evidence is inadmissible, or if I have asked you to disregard any evidence, then you must not discuss that evidence during your deliberations or consider it in reaching your verdict.
>
> The law does not permit me to comment on the evidence in any way.  I would be commenting on the evidence if I indicated my personal opinion about the value of testimony or other evidence.  Although I have not intentionally done so, if it appears to you that I have indicated my personal opinion, either during trial or in giving these instructions, you must disregard it entirely.
>     . . . .
> You may have heard objections made by the lawyers during trial.  Each party has the right to object to questions asked by another lawyer and may have a duty to do so.  These objections should not influence you.  Do not make any assumptions or draw any conclusions based on a lawyer's objections.

Therefore, any allegation that the jurors may have been influenced because of objections or the judge's comments, is unpersuasive.  State v. Sivins, 138 Wn. App. 52, 61, 155 P.3d 982 (2007) ("[J]urors are presumed to follow the instruction of the court.").

Accordingly, the trial court did not abuse its discretion when it denied Aquatherm's postverdict motion to recuse and motion for a new trial.

V

The County asserts that it is entitled to its attorney fees and costs on appeal. The County seeks fees under the CPA since the jury rendered a verdict in the County's favor for the CPA claim.

RAP 18.1(a) authorizes attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." A party prevailing on appeal is entitled to "recover attorney fees authorized by statute, equitable principles, or agreement between the parties." Thompson v. Lennox, 151 Wn. App. 479, 484, 212 P.3d 597 (2009). If the fees are recoverable at trial, they are also recoverable on appeal. Thompson, 151 Wn. App. at 484.

The trial court awarded reasonable attorney fees and costs as allowed under the CPA. RCW 19.86.090. Because the County prevails in this appeal, subject to compliance with RAP 18.1, we award attorney fees and costs to the County on appeal.

We affirm.

_____
Mann, J.

WE CONCUR:

_____
Feldman, J.

_____
Coburn, J.

-45-